ORPUT-ORPUT & ASSOCIATES, INC., Plaintiff-Appellee, *v.* DANIEL F. MC-CARTHY, Defendant-Appellant.

(No. 55988; )

First District (5th Division)—May 18, 1973.

David K. Anderson, of Skokie, for appellant.

Elroy C. Sandquist and Robert F. Fuchs, both of Chicago, for appellee.

Mr. JUSTICE LORENZ delivered the opinion of the court:

This appeal involves a contract between the architectural firm of Orput-Orput & Associates, Inc., plaintiff, and Daniel F. McCarthy, defendant. Defendant appeals from the entry of judgment for $24,521.23 plus interest against him for breach of contract and from the dismissal of his counterclaim.

*EVIDENCE*

In 1960 the J. C. Penney Company agreed to lease 14,000 square feet of first-floor space in a three-story building to be constructed by defendant. Defendant retained Perkins & Will, architects, to prepare preliminary plans. Later, because of delays in planning the project, Ralph Betts, Penney's representative, suggested a change in architects. Defendant was contacted by Raymond Orput, president of plaintiff, and later held three meetings with him. At the first meeting on December 14 or 15, 1960 in Evanston, defendant told Orput of Penney's projected October 1, 1961 occupancy date. Defendant testified that Orput agreed that if retained as architect the building would be completed in time for Penney to take possession on October 1, 1961 and the construction cost would not exceed $20 per square foot, including architect's fees. Orput denied making either statement.

On December 22, 1960, the two men, accompanied by Marshall Stevens, a construction superintendent of plaintiff, held the second meeting at defendant's Evanston office. Raymond Orput agreed to reduce the architectural fee from the standard six per cent of construction cost to five per cent if retained. Defendant claims and plaintiff denies that Raymond Orput again agreed to a $20 per square foot maximum on construction cost.

The third meeting occurred on December 30, 1960, at plaintiff's Rockford office and at a Rockford restaurant. Raymond Orput presented a

written contract, a standard printed form of the American Institute of Architects, completed by typing in the following fee provision:

"B. The Owner agrees to pay the Architect for such services a fee of not to exceed five (5%) percent of the construction cost of the Project, with other payments and reimbursements as hereinafter provided, the said percentage being hereinafter called the Basic Rate. The Architect is to be paid a guaranteed fee of 1½ [per cent] profit plus actual and all overhead for handling the professional architectual [sic]—Engineering costs in preforming [sic] this work but in no event shall the total architectural fee exceed 5% of the total cost of the Project. The Architect's fee shall apply to all alternates whether accepted or not. The office building will have plans developed on the first floor only. Plans for the interior development of other than the first floor will be preformed [sic] at the rate of $15.00 per hour."

Paragraph C-3 of the contract was changed by defendant's requiring addition of a provision that the building would be constructed in separate phases and that separate contracts, at no additional cost to defendant, would be taken on each phase. The evidence is undisputed that defendant made no request to incorporate into the contract a guaranteed time limitation for completion of construction or a square foot cost maximum. Raymond Orput, Alden Orput, his son and vice president of plaintiff, and defendant signed the contract.

Thereafter in mid-January, 1961, defendant and J. C. Penney executed a lease, providing for occupancy by October 1, 1961, but cancellable only if occupancy were not available by June 1, 1962. On January 3, 1961, defendant had met with Raymond and Alden Orput for the purpose of defining as closely as possible the features of the building. Defendant presented the Orputs with the very sketchy preliminary drawings prepared by Perkins and Will for the J. C. Penney layout. Between January 10th and 30th, 1961, four sets of preliminary plans were sent to defendant by plaintiff. The plans, forwarded to J. C. Penney, changed the layout slightly so as to relocate some of the private offices. Penney, by letter dated February 10, 1961, rejected the changes, insisting that the original plans be followed. Plaintiff revised the drawings to Penney's satisfaction and they were approved on February 17, 1961. Phase one final plans and preliminary specifications were completed on March 13, 1961. Changes made by plaintiff had resulted in the addition of 3930 square feet of rentable space without alteration of exterior dimensions. J. C. Harris & Sons, on the basis of competitive bidding, was then awarded the general construction contract for phase one and commenced construction immediately thereafter. After construction began, defendant at various

times considered adding to the building a restaurant, a swimming pool, offices for retired executives, a health club, and a fourth and fifth floor, and cutting back the building to two floors, all of which delayed by about six weeks the construction schedule.

Defendant requested and plaintiff sent to him on May 11, 1961 a cost *estimate* listing the *total* construction cost (not including architectural fees) at $1,280,000 or $18.33 per square foot. In order to save the time of taking further bids, J. C. Harris was retained in late June for the balance of the contract by means of a contract negotiated directly between Harris and defendant. In early July plaintiff prepared a form contract for this work including a penalty provision of $300 per day for failure of completion by October 1, 1961. Defendant, however, delayed signing this agreement until mid-September and agreed with Harris to delete this provision.

In July competitive bids from subcontractors under J. C. Harris and from mechanical and electrical contractors were taken. Raymond Orput, upon reviewing all bids, speculated that the estimated cost guidelines would be met. Defendant testified that plaintiff refused to approve defendant's color selection and thus delayed unnecessarily for two weeks the ordering of precast panels. The panels were not delivered until December 23 or 24, 1961; installation was completed around February 1, 1962. Some of the tenants moved in immediately thereafter. There was evidence that Harris refused to order the panels until after his own contract was signed by defendant. There was also delay by the subcontractor in submitting shop drawings to plaintiff for approval until the day after the completed panels were supposed to have been delivered under the subcontract.

Defendant was billed on phase one by the contractors and subcontractors for $1,194,175.12, the amount of their contracts. After extensive bargaining, defendant settled all the bills at $1,070,000. Plaintiff sues defendant for five per cent of the construction cost of phase one (5% of $1,194,175.12) or $59,708.76 and for $41,510.09 ($15 per hour worked) on the remainder of the project for a total of $101,218.85. Defendant's payments to plaintiff under the contract totaled $70,000. Accordingly, plaintiff prayed for $31,218.85 in its complaint for breach of contract under Count I and for $50,000 for additional services, performed over and above the contract in Count II. Defendant counterclaimed for $305,337.54, claiming damages arising out of the breach of the two alleged oral agreements (an October 31, 1961 deadline and a $20 per square foot cost maximum). The trial court dismissed Count II of the complaint and the entire counterclaim for want of equity, awarding damages of only $24,521.23 (the number of hours the court found that

plaintiff had actually worked on the project, at $15 per hour) plus interest at five per cent, on Count I. Defendant appeals from the entry of judgment on Count I and from the dismissal of the counterclaim, the dismissal of Count II and the discrepancy between the amount prayed for and the amount awarded being uncontested by plaintiff.

OPINION

The first issue presented for review is whether the following findings made by the trial court in construing the contract are against the manifest weight of the evidence: the parties did not orally agree to a cost per square foot limitation or a deadline date; the parties intended the contract term "cost" to refer to the amount charged, not the amount paid; the parties intended the five per cent contract limitation on architecture fees to refer to the cost of the structure, foundation, and interior of the first floor only, rather than to the entire cost of the project; there was no responsibility on the part of plaintiff for construction delays which resulted in any excuse to defendant to withhold payments under his contract with plaintiff. The second issue is whether interest shall be assessed against defendant for failure to timely pay the amount due plaintiff.

■■■ The vital preliminary question is whether the trial court's ruling that the parties did not orally agree that plaintiff would guarantee an October 1, 1961 deadline or a $20 per square foot maximum is against the manifest weight of the evidence. The contract does not mention either alleged agreement. When a contract is silent in essential particulars, parol evidence of prior negotiations and contemporaneous oral agreements is admissible to establish the missing parts. (*Spitz v. Brickhouse* (1954), 3 Ill.App.2d 536, 539-40, 123 N.E.2d 117, 119; *Stevens v. Fanning* (1965), 59 Ill.App.2d 285, 292, 207 N.E.2d 136, 140; *New York Cent. Development Corp. v. Byczynski* (1968), 95 Ill.App.2d 474, 476, 238 N.E.2d 414, 416.) Neither plaintiff nor defendant questions this rule. The trial judge heard all the evidence introduced, weighed its credibility, and ruled that the contract was "full and complete." We agree, and find that *Spitz v. Brickhouse* was properly followed by the trial judge.

■■ Defendant further argues that the burden is upon plaintiff to prove the entire contract, including the missing terms and cites *Continental Ill. Nat. Bank v. Nat. Casket Co.* (1960), 27 Ill.App.2d 447, 169 N.E.2d 853. But in *Continental,* plaintiff conceded that the parties orally agreed to a particular contract term, differing only in their accounts of the precise nature of the agreement. The court there held that plaintiff should bear the burden of proof. In the case at bar plaintiff does not concede that either a deadline date or a square foot maximum was ever agreed to, and therefore, neither item can be considered a term of the contract. We hold that *Continental* is not applicable, and that the trial court was

correct in ruling that the unfulfilled burden was upon defendant to prove the two alleged oral agreements.

■■ While defendant testified that Raymond Orput agreed to the October 1, 1961 deadline and the $20 per square foot maximum at the three meetings held prior to the signing of the contract, Raymond and Alden Orput testified to the contrary. The credibility of the witnesses is, of course, essentially a matter for the finder of fact. The trial judge held that no such agreement was made. "A reviewing court may not reverse the judgment of the trial court merely because different conclusions could be drawn, other results are more reasonable or if such reversal would entail a mere substitution of judgment for that of the trier of fact. An opposite conclusion must be clearly evident from all the evidence before the judgment can be disturbed." (*Gamm Construction Co. v. Berkson* (1973), 11 Ill.App.3d 42, 295 N.E.2d 537.) In view of defendant's failure to add or request the Orputs to add the cost limitation or deadline to the contract on December 30, 1960 when defendant did insist upon certain additional language (paragraph C-3) during that meeting, we find that the trial court's ruling is not against the manifest weight of the evidence.

■■ The trial court ruled that the amount *charged* defendant by the contractors and subcontractors pursuant to their contracts was "the construction cost of the Project" for the purpose of computing plaintiff's fees. The next question is whether the trial court correctly interpreted the terms of the contract. The dispute involves only the costs of the structure and foundation of the entire building and the interior of only the first floor, phase one. Defendant argues that the contract term "cost" (the amount used to compute the maximum cost figure) means the actual expense to defendant, *i.e.,* the total of $1,070,000 for which the bills were settled, while plaintiff maintains that the term "cost" means the amount charged for the same work under defendant's agreements with the general contractor and subcontractors or $1,194,175.12. The contract between plaintiff and defendant itself provides no clue as to the intention of the parties in this regard. In *Michalowski v. Richter Spring Corp.* (1969), 112 Ill.App.2d 451, 251 N.E.2d 299, the defendant argued, as does defendant here, that "construction cost" should be read to mean the amount *actually paid* for construction. The court in *Michalowski* recognized that adopting defendant's interpretation would lead to the anomalous result that the architect would be paid nothing for valuable service rendered when the project is abandoned before construction begins. We follow that case and hold that the amount charged under the construction contracts is a fair interpretation of the architect's contract term "construction cost." Were it otherwise, an owner could simply refuse

to pay his contractors and by this expedient of an unlawful act be legally released from paying the agreed fees of his architect.

■■■ No evidence was introduced by either party to prove the meaning intended at the time of contracting. The matter was apparently never considered. The court in *Stevens v. Fanning* (1965), 59 Ill.App.2d 285, 290, 207 N.E.2d 136, 139, stated the proper rule in such a situation:

> "The fundamental question in determining the meaning of a contract is always the intent of the parties. This intent is to be gathered by giving to the contract a *fair and reasonable* interpretation * * *." (Emphasis added.)

The court below properly applied this "fair and reasonable" standard to the testimony of eight witnesses. Seven of the witnesses testified that the amount charged was "fair and reasonable," only defendant testifying to the contrary. Defendant has not shown the application of this standard to be against the manifest weight of the evidence. We are aware that contracts are generally construed against the party who prepared them. (*Coney v. Rockford Life Insurance Co.* (1966), 67 Ill.App.2d 395, 399-400, 214 N.E.2d 1, 3.) However, since the interpretation urged by plaintiff complies with the "fair and reasonable" standard adopted by this court, plaintiff has met his burden. Accordingly, we find that the amount charged to defendant by his construction contractors and subcontractors ($1,194,175.12) was the "construction cost" of phase one of the project.

The next issue is whether the trial court's ruling that the five per cent limitation on plaintiff's fees applies to only phase one is against the manifest weight of the evidence. The parties refer to the work on the structure and foundation of the entire building and the interior of only the first floor as phase one. Plaintiff billed defendant for five per cent of the construction cost of phase one (5% of $1,194, 175.12) or $59,708.76, which is uncontested. The remainder of the project was billed at $15 per hour worked or $42,337.07. Defendant contests the propriety of the second charge, asserting that the five per cent maximum applies to the entire project. The parties agree that the imposition of the five per cent limitation on the work beyond phase one would yield a charge substantially below the $42,337.07 figure.

The contract provides in Section B: "a fee of not to exceed five (5%) per cent of the construction cost of the Project * * *." An alternative method of computing the architect's fee is then set out, "a guaranteed fee of 1½ [per cent] profit plus actual and all overhead * * *." Defendant contends that the phrase "construction cost of the Project" refers to all the work done on the building. If the contract made no further reference to fee computations, defendant would be correct. However, the contract further provides: "The office building will have plans developed

on the first floor only. Plans for the interior development of other than the first floor will be performed at the rate of $15.00 per hour." These two sentences establish the $15.00 per hour charge for work beyond phase one without explicitly limiting the charge to the five per cent maximum. Therefore, there exists uncertainty as to whether the five per cent maximum applies to the additional work beyond phase one.

■■■ The law is well established that where a written contract is uncertain, ambiguous, or incomplete, evidence of a contemporaneous oral agreement to prove the entire contract is admissible. (*Spitz v. Brick-house* (1954), 3 Ill.App.2d 536, 539, 123 N.E.2d 117, 119.) The parol evidence introduced clearly favors the interpretation urged by plaintiff, that no maximum is imposed on the work performed beyond phase one. Raymond Orput explained to defendant at the December 30, 1960 meeting the intended meaning of the fee application. According to defendant's own account of that meeting, the services were to be billed, subject to a five per cent limitation, and the "extras" billed at a flat $15.00 per hour. The billings of plaintiff, apparently consistent with this interpretation, were received by defendant without protest, until the present litigation arose some time later. We find the provision ambiguous. Although the court below found the fee provision unambiguous, with the aid of parol evidence we agree with the trial court's conclusion that the five per cent maximum applies only to phase one. Therefore, plaintiff billed defendant properly: 5% of $1,194,175.12 (construction cost of phase one) or $59,-708.76 for phase one and $41,510.09 (the number of hours the court found that plaintiff had actually worked on the project, at $15 per hour) for the remainder of the project.

■■ Defendant counterclaims for $305,337.54, based on the theory that plaintiff-caused delays prevented the attainment of the alleged October 1, 1961 deadline. The total construction cost of the project, including architectural fees, was $1,589,990.36 or $169,990.36 more than the allegedly agreed maximum cost of $20 per square foot for 71,000 square feet. This excess cost, together with $70,000 paid to plaintiff, $50,460.32 in lost rent and penalties paid tenants for the delay, and $14,876.83 for miscellaneous expenses caused by failure to meet the alleged deadline, form the basis of the defendant's counterclaim. We have held above that the evidence sustains the trial court's finding that the parties did not agree to an October 1, 1961 deadline date guaranteed by plaintiff. Therefore, the counterclaim, which must find its support on the existence of such an agreement, was properly dismissed.

■■ Additionally, defendant apparently argues that plaintiff-caused delays excuse defendant from making payments on the contract. The record shows conflicting testimony as to whether defendant or plaintiff

was responsible for the delays. The trial court found the plaintiff properly performed his obligations under the contract: "I think that they performed genuinely fine architectural work." In view of defendant's uncertainty as to the number of floors and the inclusion of various additions (a restaurant, swimming pool, offices for retired executives, and health club); extensive delay on the part of defendant in signing the general contract; indecision on defendant's part as to the number of floors; the fundamental change in the layout of the Penney space; and the fact that the preliminary drawings first presented to plaintiff were so sketchy as to be unworkable, we cannot say that this ruling is against the manifest weight of the evidence. In summary, we find the awarding of $24,521.23 damages to plaintiff and the dismissal of the counterclaim to be proper.

We next turn to the question of whether interest should be assessed against defendant for failure to make timely payment of the amount due plaintiff. The trial judge awarded interest on the entire decree at the statutory rate of five per cent per annum from the date the work was completed. Ill. Rev. Stat. 1971, ch. 74, par. 2, provides:

> "Creditors shall be allowed to receive at the rate of five (5) per centum per annum * * * on money withheld by an unreasonable and vexatious delay of payment."

No evidence, other than defendant's self-serving statements, tended to prove that the parties orally agreed to a cost limitation or a deadline date. We hold that no reasonable dispute existed over the amount due defendant. The entire amount awarded plaintiff by the trial court, $24,521.23, was subject to an unreasonable and vexatious delay on the part of defendant. Accordingly, we affirm the award of five per cent interest per annum on $24,521.23 from February 1, 1962, the date on which construction was completed.

Affirmed.

ENGLISH and EGAN, JJ., concur.