GARRETT CRISMORE *et al.*, Plaintiffs-Appellees, v. CATHOLIC SOCIAL SERVICE OF PEORIA, Defendant-Appellant.

Third District No. 3—84—0624

Opinion filed June 17, 1985.

HEIPLE, P.J., dissenting.

Joseph F. Hession and Danny L. Schroeder, Jr., both of Bartley, Fraser, Parkhurst & Hession, of Peoria, for appellant.

Christopher Ryan and Arthur R. Kingery, both of Strodel, Kingery & Durree, Associates, of Peoria, for appellees.

JUSTICE WOMBACHER delivered the opinion of the court:

Catholic Social Service of Peoria (hereinafter CSS) appeals from the judgment of the circuit court of Peoria County in this small-claims action brought by plaintiffs Garrett and Lynette Crismore, Kenneth and Janet Elmer, and James and Judith Moroz. CSS is an Illinois licensed child welfare agency, and has operated a licensed adoption placement service for many years. Plaintiff couples had sought the services of CSS in adopting newborn infants, and this action by them arises from their dealings with CSS in the adoption process. In their actions against CSS, each of the plaintiff couples sought to recover $600 from a $3,600 fee which they had paid previously to CSS as a fee for its adoption services.

When the plaintiff couples had made their initial applications to CSS, the adoption placement fee was placed at $3,000. Prior to payment of the placement fee, and prior to their receiving infants for adoption, CSS raised the placement fee to $3,600, in order to help defray costs of delivery and medical bills. The trial court, sitting without a jury, entered judgment for the plaintiffs and against CSS, finding that the $600 increase of fee was the result of an unconscionable contract imposed by CSS upon the plaintiffs during the adoption process. From this judgment CSS appeals.

The record reveals that the three couples had contacted CSS concerning the availability of infants for adoption in February and March of 1982. They were informed of CSS' procedures, which required an

application in writing to start the adoption process. Prior to the submission by them of their application forms, the process was discussed with them by an agency case worker in each case. In those discussions in February and March of 1982, in each case a caseworker went over the policies and procedures of CSS, as found in a CSS handbook explaining terms and conditions of the adoption program. In pertinent part, that handbook indicated the placement fee for the adoption would be $3,000, $400 of which was for a home-study fee, and the remaining $2,600 of which was to be paid at the time of the finalization of the adoption in the circuit court. Thereafter, all three couples submitted an executed application to adopt a child, wherein they were required to give pertinent background information respecting family and financial situation. A single page of the adoption application was designated as an agreement.

The agreement portion of the application did not mention or set forth any placement fee. It merely stated the adoptive parents' agreement and willingness to rear the child exclusively in the Catholic faith, and not to transfer the custody of the child to any other person. The parents agreed to assume all responsibility for the child after the adoption. It also set forth the agreement by the adoptive parents that during an initial period of supervision, prior to final adoption, while the child was with the parents, the agency still reserved and retained the right to remove the child from them in its absolute and uncontrolled discretion. The agreement specifically set forth that CSS' acceptance of the application did not bind it in any way to place a child with the adoptive parents.

The plaintiff couples submitted their applications in writing in February, March and April of 1982. They also attended agency classes, had the requisite physical exams, and had home investigations done by agency social workers. In the summer of 1982 all three couples had been approved for adoptive placements, and they were so informed. At that time none of the couples had paid CSS any part of the adoption fee, including the required initial $400 home-study fee.

On September 21, 1982, CSS mailed a letter to the three plaintiff couples, as well as to other couples approved for adoption placement, but waiting for a child. In that letter, CSS stated that the placement fee was being increased from $3,000 to $3,600 for all babies which were to be placed for adoption on or after October 1, 1982. CSS explained in the letter that the increase in fee was to allow it to make payment toward some of the medical bills faced by an increasing number of girls wishing to place their babies for adoption. The letter also solicited adoptive couples' thoughts and discussions on this increase in

fee. All three plaintiff couples acknowledged the receipt of that CSS letter of September 21, 1982.

At the time of receipt of the letter by the individual couples, no money had been paid to CSS toward the adoption fee, and no money was paid to CSS until after the agency placed babies in each couple's home. There was no significant testimony in the record indicating complaints or protestation by the couples at that time concerning the increase in the placement fee. All three couples testified that they were fearful that any action by them in that respect might result in their not receiving adoptive children. Babies were placed in the homes of the three couples by CSS in December of 1982 and January of 1983. Placement agreements were signed, and after the placements, periodic payments of the *$3,600* fee were made to CSS by the three couples. Adoption proceedings in the Peoria County circuit court were completed in December, 1983, and in January, 1984. In each case, the full $3,600 fee was paid by the individual couples without protest.

Following completion of the adoption proceedings, the three couples filed a small claims action in circuit court, seeking to have $600 of the $3,600 adoption fee refunded to each of them by the agency. The trial court, in finding for the plaintiffs and against CSS, noted the superior and dominant position of CSS with respect to the plaintiffs in the situation. It concluded that:

> "Social mores dictate that placement of a child cannot be governed by the ordinary rules of contract where parties deal at arm's length. Child placement is fraught with strong emotion and anxiety. For this reason, there was gross inequality in the bargaining positions of the parties, together with imposition of a term unreasonably favorable to the stronger party. *Restatement of Contracts* 2d, Section 208; IICLE *Contract Law*, Section 2.45, *et seq.*"

We reverse.

The plaintiff couples advance several theories in support of the trial court's judgment. They contend that there was a written contract between each plaintiff couple and CSS at the time of application by the couples. This contract, according to plaintiffs' argument, consisted of the signed agreement, where no mention was made of the placement fee, supplemented by the conditions set forth in the CSS handbook, which set the placement fee at $3,000. It is contended that there was an offer by CSS to provide its services, in exchange for the $3,000 fee, and that such offer was accepted by each individual couple. Alternatively, it is argued that an oral contract with a $3,000 fee existed, based upon the representations by CSS personnel that the

placement fee for the service would be $3,000. As a third alternative, the plaintiffs contend that there was an implied contract, based upon the intentions of all parties to form a contract.

It is contended by plaintiffs that the fee increase of September 1982 constituted a new contract offer with no new consideration flowing from CSS. Plaintiffs assert that their acquiescence in the alteration of the initial contract was the result of implied coercion and unequal bargaining power between them and CSS. The plaintiffs testified, in substance, that they felt any protest or refusal to pay the increased fee would have resulted in CSS' not placing any baby with them.

■ We find, initially, that there was no enforceable contract between the individual couples and CSS which set the placement fee at $3,000. The only document executed by these couples prior to the announced increase in fee was the agreement with respect to their willingness to abide by certain terms and conditions of the adoption process. Neither in that agreement, contained within the application, nor on any other document executed by them, was the placement fee set at $3,000. So far as the CSS pamphlet's mention of the $3,000 fee, nothing indicates incorporation of that provision into the parties' agreement, nor is there any indication in the pamphlet that the fee was not subject to adjustment by CSS. Furthermore, there is nothing in any document or oral discussion indicating the intentions of all parties that the $3,000 placement fee was to be a binding and enforceable part of CSS' agreement.

The letter of September 21, 1982, is further evidence of the parties' agreement, for the increase in fee of $600 was made unilaterally by CSS, without prior consultation with any of the prospective adoptive parents affected by it. The letter merely stated that the fee would be increased for babies placed after October 1, 1982, and explained this change *in policy*, referring to increased medical costs to mothers. The letter also requested discussion about the increase from interested prospective parents. The record also indicates that the increase went into effect, the plaintiffs continued to participate without protest, received their infants, and paid the $3,600 fee set by CSS in that letter. Both the letter, and the plaintiff couples' responses to it, belie a suggestion that all parties understood that the $3,000 placement fee was binding and enforceable as of the date the written applications were submitted.

We can understand the plaintiff couples' hesitance in not wanting to "rock the boat," under the circumstances, but their lack of objection or assertion of a right to the services at the $3,000 figure, espe-

cially in the face of solicitation of comment and discussion by CSS, is significant. Whatever their motivation, their failures to protest are evidence of their understanding of the overall agreement, including their rights thereunder, as well as of their acquiescence to the new fee announced by CSS. Contrary to suggestions by counsel in the brief, there is no evidence of any threats by CSS to withhold its services if these couples insisted on the $3,000 figure. In summary, the plaintiffs fail to produce sufficient evidence to indicate and establish a binding and enforceable agreement between them and CSS with respect to the $3,000 placement fee.

While our finding of the lack of an agreement at the $3,000 figure would require reversal of the court's judgment, some discussion of the court's further findings is necessary, for even assuming, *arguendo*, the existence of such a contract, we would reverse the decision of the trial court. In the judgment order, the trial court found that CSS had acted in an unconscionable manner in increasing the placement fee from $3,000 to $3,600. The evidence in the record, on the other hand, establishes no unconscionable action on the part of CSS. In fact, quite inexplicably, the judgment order itself contains a finding that all parties, including CSS, acted, "prior to and during the trial of this case, with the utmost of morality and good faith." That finding is borne out in the record.

The evidence in the record establishes that CSS, in its dealings with the plaintiffs, acted in a straightforward and direct manner, informing them both of the increase in fee and of its reasons. In addition, as already noted, CSS solicited the comments of prospective adoptive parents concerning the increase of the fee. Given this evidence in the record, as clearly found by the trial court, the mere fact that there was a difference in bargaining power between CSS and the individual couples is not sufficient, of itself, to support a conclusion that CSS imposed an unconscionable contractual provision when it notified the individual couples of the increase in fee.

■ Despite this evidence in the record, and the trial court's findings, the plaintiffs on appeal argue that the increase in fee was the result: (1) of an unconscionable contract; (2) of moral duress imposed by CSS on the plaintiff couples; or (3) the result of a breach of CSS' fiduciary or confidential relationship with the plaintiff couples. Given the facts of this case, however, none of the three theories is viable, for in none of the authorities cited by the plaintiffs is the mere fact of inequality of bargaining position sufficient of itself to uphold the finding of unconscionability, moral duress, or the violation of a fiduciary or confidential relationship.

As to unconscionability, there was nothing unreasonable about either the size of the increase in fee nor its purpose. Nor was there any evidence of unreasonableness in the manner in which the policy change was announced. There may have been a difference in bargaining position, but that does not invalidate otherwise reasonable terms and conditions of an agreement. Plaintiffs' own authorities concede as much. Further, there is nothing about the plaintiff couples' situations indicating special circumstances taken advantage of by CSS. The couples were well-educated, financially capable, and able to voice their own concerns and positions. Furthermore, as noted, there was no evidence whatsoever of unconscionable behavior or action by CSS or its personnel.

All of the theories advanced by the plaintiffs to support the trial court's decision involve some degree of improper behavior on the part of one party, usually in the form of oppression, undue influence, undue advantage, or illicit gain. The trial court's own findings indicated CSS' good faith and morality throughout. As this judgment order indicated, there were no facts presented which indicated wrongful or improper behavior by CSS in its dealings with the plaintiff couples, and that finding, which is supported in the record, fatally undermines the theories advanced by the plaintiffs in support of the judgment order in their behalf.

While we reverse the decision of the trial court in this matter, we would emphasize our understanding that the court believed that consideration of fairness justified recovery by the plaintiffs in this case. Under the facts as found in the record in the instant case, however, the law does not support a recovery on behalf of the plaintiffs and against CSS.

For the reasons stated, the judgment of the circuit court of Peoria County in the above action is reversed.

Reversed.

SCOTT, J., concurs.

PRESIDING JUSTICE HEIPLE, dissenting:
Plaintiffs sought to adopt babies through defendant adoption agency. In the middle of the adoption process, defendant announced an increase from $3,000 to $3,600 in its fee. Plaintiffs paid without protest, but sued following final placement of the children to recover the $600 increase.

The initial conclusion reached is that there was no enforceable

agreement that the consideration for defendant's services would be $3,000. The majority analyzes the "only executed document" and finds that there is no mention of the amount of the fee. The fee is found in defendant's handbook, which was read to the plaintiffs prior to execution of the agreement. However, it is found that there was no indication that the terms of the handbook were incorporated into the agreement. Furthermore, there was nothing to prove that the parties intended that the $3,000 fee was to be part of a binding and enforceable agreement.

These arguments do not persuade. That the fee was not incorporated into the executed document is not important. Price is certainly an essential term of any service contract. As price was not mentioned, the document was clearly not a final statement of the parties' entire agreement. Thus, the existence of such a term could be and was proved by parol evidence. (*Orput-Orput & Associates v. McCarthy* (1973), 12 Ill. App. 3d 88, 298 N.E.2d 225.) It is equally unimportant that the handbook was not specifically incorporated, as the agreement on price was provable independently. That the parties did not intend the $3,000 fee to be enforceable and binding is doubtful. Why quote a price if it is not going to be enforceable upon completion of services? Nothing in the handbook or the application for placement mentioned that the fee was subject to change at defendant's option. Finally, the court below implicitly found that there was at some point an enforceable agreement for $3,000.

To support the position that the parties did not make a binding agreement, the majority cites the letter informing plaintiffs of the fee increase. This supposedly is evidence of the lack of a binding agreement on a price term. However, the whole point of this case is that it was a breach of contract to raise the fee unilaterally. The letter is merely self-serving and contradicts the finding of the court below that there was an agreement at $3,000. Lastly, the failure of the plaintiffs to respond (even though invited by defendant to do so) to the increase supposedly proves that they had no binding contract to fall back on to challenge the increase. However, this is clearly rebutted by uncontradicted testimony that if they had not paid or had complained, the chances of getting a child would have been jeopardized. In response, the majority points to the lack of threats by defendant to withhold its services if the couples insisted on their rights. Of course there was no such evidence. Threats were not necessary.

The opinion concludes with some unabashed *dicta* as the majority dismisses the unconscionability and duress arguments after already deciding that plaintiffs had no contractual right to recover.

The better analysis is that defendant's new price term constituted an offer for modification without additional consideration. However, since the contract was fully executed, plaintiffs may not recover unless they prove fraud, duress, mistake or other improper influence (*Rocker v. Murphy* (1975), 24 Ill. App. 3d 1045, 322 N.E.2d 541). Thus, we turn to the question of whether duress or other improper influence caused plaintiffs to accept the contract as modified.

The question is close. The court found, and correctly so, that there was gross inequality in bargaining power. This was very much a take-it-or-leave-it contract. The $600 increase was imposed unilaterally without prior consultation or a meaningful opportunity to respond. On the other hand, the court also found that all parties acted "with the utmost of morality and good faith." There was an exaction from plaintiffs, but it was based upon increased costs which plaintiffs might legitimately be expected to bear. Finally, defendant is an eleemosynary organization with no motivation to seek illicit pecuniary rewards.

We cannot concur with the unconscionability rationale set forth by the trial court. While the increase from $3,000 to $3,600 may have been accomplished in part by unequal bargaining power, there is nothing inherently unconscionable about a $3,600 fee as opposed to $3,000.

Plaintiffs' other arguments (duress, undue influence, etc.) are not entirely applicable either. There is no showing that defendant sought to overcome the will of plaintiffs in seeking the fee increase. There was no confidential or fiduciary relationship as such between the parties. There was certainly no fraud or deceptive conduct.

Nonetheless, I believe that the court below should be affirmed. This is a perfect example of the "other improper influence" as referred to in *Rocker*. To a certain extent, the contract at issue is *sui generis*. Thus, the commonplace examples of improper influence do not appear. We do not have the typical duress which occurs where the promisor refuses to perform in the middle of a job, leaving it in a state of disarray, yet demands additional compensation to finish. We do not have the typical unconscionability found in a contract of adhesion between a wealthy merchant and a poor consumer seeking to purchase one of life's necessities on credit. We do not have the undue influence usually practiced by one in a confidential relationship with a dependent individual. In this case, we have some elements of each. There was duress in that the plaintiffs were pressured into paying the fee increase because they reasonably believed that noncompliance would have destroyed their chances for an adoption. There was the

same absence of arms-length negotiation found usually in unconscionable contracts. Most importantly, there was abuse of something resembling a confidential or fiduciary relationship. Plaintiffs were supplicants to the defendant, who by contract had unbridled discretion to terminate the adoption process. Defendant knew very well that meaningful resistance to its fee increase by those in the middle of the process would not be forthcoming.

The adoption of a baby entails a substantial emotional commitment. Plaintiffs' testimony makes it clear that they went along with the fee increase without protest to protect this commitment. That the increase was a unilateral modification of a contract was disturbing, but hardly worth fighting against if the placement of their children were jeopardized. Therefore, I find that the contract modification was procured as a result of improper influence. Accordingly, I would affirm the judgment of the trial court.