NITRIN, INC., Plaintiff-Appellant, *v.* BETHLEHEM STEEL CORPORATION, Defendant.—(FOSTER WHEELER CORPORATION, Defendant-Appellee.)

First District (5th Division) No. 60934

Opinion filed January 23, 1976.

Richard J. Phelan, Matthew J. Iverson, and Paul F. Hanzlik, all of Chicago (Isham, Lincoln & Beale, of counsel), for appellant Nitrin, Inc.

Hackbert, Rooks, Pitts, Fullagar & Poust and Wildman, Harrold, Allen & Dixon, both of Chicago (Max Wildman, Harold W. Huff, and Kay L. Schichtel, of counsel), for appellant Bethlehem Steel Corp.

Norman J. Barry and John J. Coffey, both of Chicago (Rothschild, Barry & Myers, of counsel), for appellee.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

Defendant, Foster Wheeler Corporation, a general contractor, entered into a contract with plaintiff for the construction of an anhydrous ammonia plant in Cordova, Illinois. Defendant retained Bethlehem Steel Corporation to fabricate the key component of the plant, a large pressure vessel known as a converter. The converter built by Bethlehem failed on two occasions and was replaced by plaintiff. This action was brought by plaintiff against defendant and Bethlehem to recover its damages. At the close of plaintiff's case the trial court granted defendant's motion for a directed verdict. The action against Bethlehem was submitted to the jury which returned a verdict in the amount of $4,769,907.50 in plaintiff's behalf.[1] This appeal is taken from the order granting defendant's motion for directed verdict.

Plaintiff contends that (1) the trial court erred in granting defendant's motion for a directed verdict since sufficient evidence, as measured by the standard enunciated in *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504, was introduced to establish a breach of contractual guarantees by defendant, (2) the trial court erred in denying its motion in limine to exclude all mention of its insurance coverage, and (3) the trial court erred in striking a count of plaintiff's amended complaint which was predicated on an alleged breach of the implied warranties imposed by the Uniform Commercial Code.

Plaintiff is a joint venture of International Minerals and Chemical Corporation and Northern Natural Gas Company. In August 1962 it contracted for the design and construction of an anhydrous ammonia plant which was to be part of an integrated chemical facility being developed in Cordova, Illinois. The contract price for the ammonia plant was $5,304,000. The anhydrous ammonia (anhydrous means without

---

[1] Case No. 60987 (35 Ill. App. 3d 596), which we have decided today, is Bethlehem's appeal from the judgment on the jury verdict entered against it.

water) would be used in a variety of products, most importantly fertilizer.

Ammonia is a chemical compound consisting of hydrogen and nitrogen. In the Cordova plant the Casale process was the method used to synthesize this compound. Defendant was the exclusive licensee of the Casale process in the United States. The process is initiated by feeding hydrogen, derived from natural gas, and nitrogen, derived from compressed air, into compressors where the gases are subjected to pressures of up to 9,000 to 10,000 pounds per square inch. The compressors are located adjacent to the converter. The gases are then piped under this high pressure to the converter. They enter the vessel through a horizontal inlet bore in the bottom closure. The horizontal bore joins a vertical "uptake" bore which directs the gases to the "internals" of the converter. It is here, in the presence of a catalyst, that the gases react to produce ammonia. A catalyst is a substance which facilitates a chemical reaction but which does not enter into that reaction. In the next stage of the process, the ammonia gas is piped to a unit designed to condense it into anhydrous ammonia liquid, the final product. The production of ammonia is a continuous process. The plant, while in production, was in operation 24 hours a day.

Defendant retained Bethlehem Steel Company (hereinafter Bethlehem) to fabricate the converter used in plaintiff's plant. The vessel built by Bethlehem was six feet in diameter, 70 feet in height and 270 tons in weight. It was delivered to the plant site in August 1963. On October 1, 1963, plaintiff took over care, custody and control of the plant. The next several months were a shakedown period for the facility. Production tests were conducted and completed in July 1964 following which plaintiff formally accepted the plant. At the conclusion of these production tests the facility was producing 415 to 420 tons of ammonia per day; the contract guaranteed a production rate of 400 tons per day.

On October 3, 1964, a crack developed in the inlet bore in the bottom of the converter, and the plant was shut down. An inspection of the bottom closure revealed that the junction of the horizontal and vertical portions of the inlet bore formed a "sharp corner." Substantial "rough machining" was found in the immediate vicinity of the sharp corner in the bore. Representatives of plaintiff, plaintiff's insurer, defendant and Bethlehem met at the Cordova plant to discuss means of putting the facility back in operation. At the conclusion of these meetings, at the urging of, among others, its insurer, plaintiff decided to repair the vessel by "field welding." The portion of the vessel containing the crack was cut away, and the void was filled by welding. The plant was placed back in operation on January 16, 1965. Contemporaneously with the comple-

tion of repairs, a replacement converter was ordered from the Chicago Bridge & Iron Company (hereinafter Chicago Bridge & Iron). The original vessel failed a second time in October 1966 and was scrapped. The replacement converter was placed in operation in December 1966.

Plaintiff brought suit in contract and tort against defendant and Bethlehem to recover damages caused by the failure of the pressure vessel. The suit was originally filed in 1967 as cause No. 67 L 12356. It was refiled in 1972 as cause No. 72 L 8456. In cause No. 72 L 8456 three amended complaints were filed. Count V of the first amended complaint alleged that defendant impliedly warranted, pursuant to the Uniform Commercial Code, that the pressure vessel would be fit for the purpose intended and would meet an implied warranty of merchantability. Defendant moved that this count be stricken, arguing that its contract with plaintiff was not a contract for the sale of goods and therefore was not within the purview of the Uniform Commercial Code. The court granted defendant's motion.

Plaintiff's third amended complaint directed three counts against defendant. All three counts prayed that a judgment in the amount of $1,-640,351 be entered against defendant for direct damages incurred by plaintiff. Counts IV and VI alleged negligence and willful and wanton misconduct, respectively, by defendant in the design of the converter. Plaintiff dropped these two counts prior to trial following the denial of its motion in limine to prohibit the introduction of evidence regarding its insurance coverage.

Count V contained the allegation that defendant had breached its guarantees in section 5.3 of the contract, which provides:

> "Contractor guarantees that the field construction workmanship shall be free from defects and that all design work done on said plant shall likewise be free from defects. In the event there is any defect in workmanship or design and the same is reported to Contractor by Owner in writing at any time within 12 months after Owner has accepted the plant, Contractor shall, as soon as reasonably possible and, in any event, within five days of receipt of said written notice, commence to remedy such defect and proceed diligently thereafter to complete such remedy. If Contractor fails to commence to remedy the defect within such period of time or to proceed diligently to complete such remedy, Owner may itself or by a third party undertake to remedy the defect, and if the cost of remedying same exceeds the amount that would have been chargeable by Contractor under Section 5.4 for such work, Owner, without foregoing any other rights it may have against Contractor in respect of such defect, shall be entitled to

reimbursement from Contractor for the amount of such excess. In the absence of any defect in workmanship or design, Contractor shall have no obligation to repair the normal effect of corrosion, erosion, normal wear and tear and abnormal operating conditions."[2]

Defendant asserted two affirmative defenses, (1) that after the crack in the converter was first discovered, plaintiff had the option of having it repaired in the field or having it shipped to Bethlehem's mill in Bethlehem, Pennsylvania, for replacement of its "bottom head"; that defendant advised plaintiff that the success of field repair was doubtful; that notwithstanding this advice, at the urging of its insurance carrier, plaintiff elected to proceed with field repairs, and that in so doing plaintiff waived any claim to recover for damages caused by the failure of the repaired converter, and (2) that plaintiff had obtained insurance to cover the losses which were the subject of the complaint; that the suit was in reality a subrogation action; that under section 8.9 of the contract plaintiff agreed to waive subrogation and that, therefore, the contract barred plaintiff's claim. Section 8.9 provides:

"When the plant is 'ready for operation' as defined in Section 8.8, Contractor shall so advise Owner in writing. Unless Owner

---

[2] In addition to section 5.3, the following guarantees were provided under the contract:

"Sec. 5.1 *Design*

Contractor guarantees that, upon its completion, the plant will be engineered and designed to perform and will be capable of performing as provided for in Exhibit A, subject to the condition set forth therein.

Sec. 5.2 *Materials Guarantees*

With respect to all machinery, equipment and materials which are used and installed in the plant, Contractor shall, for the protection of Owner, make available to Owner to the full extent of the terms thereof, such guarantees as are available from all vendors or subcontractors. Such guarantees shall extend for a minimum of one year from date of completion of the plant 'ready for operation' or for eighteen months from the date on which the machinery, equipment or materials have been delivered to the job site, whichever is the shorter period.

❖    ❖    ❖

Sec. 5.4 *Costs*

Any costs incurred by Contractor in correcting defects in the plant so that the same shall conform to and perform in accordance with the guarantees hereinabove set forth shall be deemed costs of the work and charged to Owner as provided in Article III hereof; provided, however, that in no event shall the Guaranteed Maximum Price be adjusted therefor and, provided further, that if such costs are incurred after final settlement and if Contractor has received payment under Section 3.3 (Division of Savings), then Contractor shall bear 25% of such costs unless the sum of such costs and the Contract Price exceeds the Guaranteed Maximum Price, in which event Contractor shall bear all such costs to the extent that such sum exceeds the Guaranteed Maximum Price."

shall advise Contractor within ten days thereafter why the plant is not ready to operate, the care, custody, and control of the plant shall pass to Owner. In any event, care, custody and control of the plant shall pass to Owner no later than the time when Owner takes physical possession thereof. *From and after the date of the transfer of care, custody and control of the plant, Owner shall assume all risk of physical loss and damage thereto and shall waive subrogation against Contractor for loss or damage which may thereafter be covered under Owner's insurance.*" (Emphasis supplied.) In response, plaintiff denied all allegations made by defendant. Plaintiff also moved to strike the affirmative defenses, asserting that they were raised "solely to improperly insert insurance as an issue in this law suit." The motion was denied.

Prior to trial, plaintiff moved for an order prohibiting both defendant and Bethlehem from "introducing, before the jury, any evidence of or making any reference to any facts or circumstances which would indicate, suggest, or imply that [plaintiff] carried insurance." Plaintiff further moved that the court prohibit defendant and Bethlehem from referring before the jury to any pleading which raised the subject of its insurance coverage. In memoranda filed in support of the motion plaintiff stated that as a matter of law section 8.9 of the contract did not bar its action against defendant and again raised its argument that defendant asserted its affirmative defenses solely as a ploy to enable it to reveal to the jury the fact of plaintiff's insurance coverage. The motion was denied. The parties then entered into the following "Stipulation Concerning Insurance:"

"It is hereby stipulated and agreed by and between the attorneys for Nitrin, Inc. ('Nitrin'), Bethlehem Steel Corporation ('Bethlehem'), and Foster Wheeler Corporation ('Foster Wheeler') as follows:

1. The parties may not prove directly or indirectly with respect to the policies of insurance in force for Nitrin's benefit at the time of the occurrences (on October 3, 1964 and October 26, 1966), either the named insureds, other than Nitrin, or the policy limits.

2. The parties may not prove directly or indirectly what amounts were paid by Nitrin's insurer to Nitrin, except that the Plaintiff stipulates that all direct damages arising from these two occurrences, including the cost of the welding, repair, the replacement converter, and the installation thereof, were paid to Nitrin by Nitrin's insurer.

3. The parties may not prove directly or indirectly the content of the proofs of loss, or any negotiation in connection with the settlement of the losses.

4. Plaintiff stipulates that a waiver of subrogation was not obtained by Nitrin for Foster Wheeler on any of Nitrin's policies of insurance."

At trial the stipulation was read into the record but not in the presence of the jury.

Plaintiff's sole count against defendant at trial was Count V of its third amended complaint alleging a breach of contractual guarantees. During the presentation of its case plaintiff called 16 witnesses. The testimony of five of them is particularly pertinent to the resolution of the issues raised in this appeal.

Dr. Robert Cloud, Manager of the Mechanics and Materials Technology Group of the Westinghouse Corporation, and Dr. Bruno Boley, Dean of the Northwestern University School of Engineering, were called as expert witnesses to testify as to the cause of the breakdown of the converter. Both had made calculations of the stresses present in the metal in the vicinity of the crack in the inlet bore. Both found that existing stresses were multiplied by "stress raisers." Both identified these stress raisers as rough machining and sharp corners in the inlet bore. Both concluded that the vessel failed because the rough machining and sharp corners increased the stress on the materials involved to a level which they could not withstand. In addition both testified that if sharp corners and rough machining had not been present, the converter would not have failed.

William Wong, defendant's project manager for the construction of the ammonia plant, was called as an adverse witness. He testified that defendant had overall design responsibility for the Cordova, Illinois, facility. The Casale process of producing ammonia was used in the plant. Specifications with regard to the physical dimensions and production parameters of the converter were dictated by Casale. The design of the converter was not furnished by defendant. Rather, it was the responsibility of the builder of the vessel.

Clarence J. Sweeney, an engineer and salesman employed by Bethlehem, was called as an adverse witness and testified that he dealt with defendant on the Nitrin project. If Bethlehem's engineering department desired information from a customer, the inquiry would go through Sweeney. Defendant submitted to Bethlehem a purchase order which included specifications for the converter for plaintiff's plant. Defendant's drawings indicated that the "working pressure" of the vessel would ap-

proach 10,000 pounds per square inch. Its design specifications submitted to Bethlehem in May 1962 state:

"The vessel shall be designed for at least most severe conditions of pressure and temperature. Besides the internal pressure, the loading shall include all dead and superimposed loads, localized stresses and stresses through the temperature gradients in vessel."[3]

In the purchase order defendant reserved the right to inspect the converter while it was being fabricated in Bethlehem's shop and to be present to observe tests of the vessel. Sweeney was shown blueprints of ammonia converters and pressure vessels built by Bethlehem for various customers. These drawings had been prepared by Bethlehem personnel. They bore notations concerning such matters as shape, physical dimensions and configuration of head forgings. Some drawings included instructions with regard to machining. These notations had been made by employees of Bethlehem. The head forgings of these vessels differed from that of the converter Bethlehem built for plaintiff's plant. These vessels did not have sharp corners in their inlet bores.

Plaintiff also called Lester Pfeiffer, a design engineer employed by Chicago Bridge and Iron in its pressure vessel engineering group, who testified that he was so employed when the order was placed for the replacement converter for plaintiff's plant. Chicago Bridge and Iron built the replacement vessel in accordance with specifications and schematic drawings supplied by defendant. This was standard procedure within the industry. It was the manufacturer's responsibility to draft shop drawings and fabrication drawings, that is, to design the vessel. The specifications with which defendant supplied Chicago Bridge and Iron, including those for the inlet bore, were identical to the ones given Bethlehem. Chicago Bridge and Iron's design drawings for the vessel included instructions that the inlet bore was to have round corners and was to be machined to a "smooth finish." Rounding of the corners did not change the angle of the junction of the vertical and horizontal portions of the inlet bore of the replacement vessel a single degree or minute from that of the original vessel. Defendant did not instruct Chicago Bridge and Iron to use round corners. Rather, having concluded that sharp corners would subject the vessel to excessive pressure and could cause cracks to develop, Chicago Bridge and Iron, "as a good manufacturer," decided to round the corners. As to the rough machining found in the Bethlehem

---

[3] With regard to the term "load," Dr. Cloud testified:

"In simple terms we could say that stress is a measure of the amount of load being carried by some given part or some location. When I use the term 'load' I mean simply a force, either weight, pressure, or force; a load is measured in terms of pounds."

vessel, Pfeiffer testified that if the vessel had been properly inspected, this stress raiser would have been found. The machining of the inlet bores was the responsibility of the manufacturer, not that of defendant. Chicago Bridge and Iron had built ammonia converters for defendant since 1952. All used the same inlet bore configuration as the converter built for plaintiff. None of these vessels had ever failed. Pfeiffer testified that the vessel built by Bethlehem was the only ammonia converter he knew to have ever failed.

Plaintiff's other witnesses testified as to the existence of the contract between plaintiff and defendant, the operating procedures used at the Cordova facility, the inspection of the pressure vessel following the first failure, the fact of the second failure and the damages suffered by plaintiff as a result of the two failures.[4]

At the close of plaintiff's evidence, defendant moved for a directed verdict. As grounds therefor defendant argued that plaintiff failed to establish a prima facie case because (1) there was no evidence that the converter failed because of defects in field workmanship or design work done on the plant as provided in section 5.3 of the contract; (2) there was no evidence that plaintiff ever gave defendant any written notice of any defect in field workmanship or plant design as required by the contract; (3) there was no evidence that defendant had failed to prove that its costs incurred in correcting the defects exceeded the guaranteed maximum price or were otherwise reimbursable to plaintiff under section 5.4 of the contract; and (4) there was no evidence of any defect in the design of the converter. As an additional ground defendant argued that plaintiff's suit was in the nature of a subrogation action and, as such, barred by section 8.9 of the contract. Following arguments on the motion, the court granted a directed verdict in favor of defendant. The court did not specify the grounds on which it based its decision.

In *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 510, 229 N.E.2d 504, our Supreme Court held that "* * * verdicts ought to be directed * * * only in those cases in which all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (See also *Breault v. Feigenholtz*, 54 Ill.2d 173, 296 N.E.2d 3; *Stewart v. Huff*, 14 Ill.App.3d 782, 303 N.E.2d 641.) Plaintiff contends that it introduced substantial evidence tending to prove a breach of contractual guarantees by defendant, that this evidence was clearly adequate to meet the *Pedrick* standard, and that therefore the trial court

---

[4] Plaintiff alleged that it spent $323,873 in attempting to repair the pressure vessel, and that it was required to pay $1,316,478 for a new pressure vessel.

erred in granting defendant's motion for a directed verdict. We disagree.
. The parties to the instant appeal appear to be in agreement that the failure of the converter was caused by the presence of two stress raisers, namely, sharp corners and rough machining, in the intake bore of the bottom closure of the vessel. It is plaintiff's position that the presence of these stress raisers constituted a breach of section 5.3 of the contract. Section 5.3 provides, in pertinent part, that "Contractor guarantees that the field construction workmanship shall be free from defects and that *all design work done on said plant shall likewise be free from defects.*" (Emphasis supplied.) Plaintiff argues that under any one of three theories its evidence demonstrated that defendant breached this design guarantee.[5]

■■ Initially it is asserted that the specific configuration of the bottom closure of the converter necessitated the presence of sharp corners at the junction of the horizontal and vertical portions of the intake bore. Sharp corners in the bore contributed to the formation of cracks in the closure. The configuration present in the Bethlehem vessel was required to allow piping leading from the compressors to connect with the converter. Hence, plaintiff reasons, defendant's design of the ammonia plant necessitated the presence of stress raisers and therefore was defective.

We believe that the evidence adduced by plaintiff failed to demonstrate that defendant's design of the system required the presence of sharp corners in the intake bore. Under its agreement with plaintiff, defendant's responsibilities included designing the overall scheme of the plant. However, defendant neither designed nor fabricated all component parts of the system. Rather, it supplied subcontractors with relevant sketches and specifications and left these responsibilities to them. The specifications with which Bethlehem was provided required that the configuration of the intake bore be such that it would link up with the converter. Detailed design work was left to the fabricator. Thus, defendant did not include instructions with regard to the machining of the intake bore. Bethlehem failed to round the corners of the bore and to smoothly machine the interior surfaces. As a result, the bore was subjected to excessive stress, and the vessel failed. Chicago Bridge and Iron received identical specifications from defendant. The intake bore in its converter was required to fit the same connection as that of defendant. Chicago Bridge and Iron, however, included in its design for the converter instructions to round the corners and machine the surfaces to a smooth finish.

---

[5] Plaintiff does not contend that it proved that defendant breached its guarantee of defect free field workmanship. This guarantee, it appears to concede, applies only to construction work done at the Cordova plant site.

Such machining left the angle of the bore unchanged from that of the Bethlehem vessel. Chicago Bridge and Iron acted as it did with regard to machining as a "good manufacturer." It had been building converters for defendant utilizing the same bore configuration since 1952. None of these vessels had ever failed.

Thus, plaintiff's own witnesses established that the head configuration used in its converter had proved successful in the past, that the presence of stress raisers, that is, sharp corners and rough machining, in the converter built by Bethlehem was not directed by defendant in its specifications, that these stress raisers could have been removed without changing the head configuration, and that, indeed, as a matter of manufacturing technique, they should have been removed. On the basis of this evidence it is clear that no jury verdict that defendant's design work on the Cordova ammonia plant was defective could ever stand.

Plaintiff next argues that section 5.3 contained defendant's unqualified guarantee that all design work done on the ammonia plant would be free from defects for a period of one year from the date on which the plant was accepted. Plaintiff claims that nothing in this section limited defendant's guarantee to its own design work or relieved defendant from responsibility for design work done on the converter by Bethlehem. It relies, in part, on section 2.3 of the contract which provides that defendant was "completely responsible for  *  *  * all process design and engineering work and, in connection therewith, shall prepare detailed plans and specifications.  *  *  *"

We believe that this argument distorts the structure of guarantees written into the contract. Under section 5.3 defendant was obligated to design and erect a facility capable of meeting certain specified production levels. It is not, as plaintiff would have us hold, a guarantee by defendant of the various component parts of the plant ordered from subcontractors. Section 5.2 of the contract protected plaintiff against subcontractors' defective manufacturing techniques or design work. It provides:

> "With respect to all machinery, equipment and materials which are used and installed in the plant, Contractor shall, for the protection of Owner, make available to Owner to the full extent of the terms thereof, such guarantees as are available from all vendors or subcontractors. Such guarantees shall extend for a minimum of one year from date of completion of the plant 'ready for operation' or for eighteen months from the date on which the machinery equipment or materials have been delivered to the job site, whichever is the shorter period."

Our reading of the guarantee provisions of the contract is bolstered

by the presence of section 8.2 which allowed plaintiff to direct defendant's placement of orders with subcontractor's.[6] In addition, we note that under section 8.3 of the contract plaintiff reserved the right "* * * to approve any subcontractor proposed by Contractor to perform any portion of the work which Contractor believes can be more economically performed by a subcontractor than by Contractor's own forces . * * *." As defendant has pointed out, in view of the vesting of such discretion in plaintiff, it would be "commercially absurd" for a general contractor to guarantee each piece of equipment in a plant it agreed to build.

Moreover, the evidence on which plaintiff would have us rely as demonstrating that the converter built by Bethlehem was poorly designed will not support that contention. As we have noted above, the failure of the converter was due to its faulty manufacturing technique.

Finally, plaintiff asserts that the section 5.3 guarantees were breached due to defendant's failure to adequately inspect and monitor Bethlehem's work in constructing the converter. It points out that Bethlehem's designs were submitted to defendant for approval. It asserts that proper inspection would have enabled engineers to spot and correct the sharp corners and rough machining. To bolster this argument plaintiff points to defendant's purchase order for the converter which specifically reserved the right to inspect and monitor the subcontractor's work.

Although more stringent supervision of Bethlehem's fabrication of the converter may well have enabled engineers to correct the defects in the bore, we are not persuaded that this constitutes grounds for reversing the judgment entered below. Plaintiff went to trial only on the allegation that defendant had breached certain contractual guarantees. We find no duty imposed by the contract requiring defendant to inspect component parts as they were being manufactured. We therefore reject this argument.

Plaintiff has pointed to the presence of some evidence tending to establish a breach of contractual guarantees by defendant. But, as the court noted in *Pedrick*, "* * * the presence of *some* evidence of a fact which, when viewed alone may seem substantial, does not always, when viewed

---

[6] Section 8.2 provides:

"Owner and Contractor shall mutually prepare a purchasing procedure manual setting forth in detail the procedures by which quotations shall be obtained, the successful bidder selected and purchase orders issued. If Owner requires Contractor to purchase from bidder other than the one recommended by Contractor and previously approved by Owner as a bidder, then the Guaranteed Maximum Price shall be adjusted by the amount by which the price of the bidder specified by Owner differs from that of the bidder recommended by Contractor."

in the context of all of the evidence, retain such significance. * * · * Constitutional guaranties are not impaired by direction of a verdict despite the presence of some slight evidence to the contrary [citations], for the right to a jury trial includes the right to a jury verdict only if there are factual disputes of some substance." (37 Ill.2d 494, 504-05.) In the instant case the evidence introduced by plaintiff was not sufficiently substantial to establish a breach of contractual guarantees by defendant. Consequently, we cannot say that the court erred in directing a verdict in favor of defendant.

As an additional basis for granting it a directed verdict, defendant asserted that the waiver of subrogation language in section 8.9 of the contract made the section 5.3 guarantees unavailable to plaintiff. Plaintiff argues that this assertion is without merit. Our holding that plaintiff failed to establish a breach by defendant of the section 5.3 guarantees constitutes sufficient grounds for upholding the directed verdict and therefore we need but briefly discuss plaintiff's contention.

Section 8.9 provides in pertinent part that "* * * from and after the date of the transfer of care, custody and control of the plant, Owner shall assume all risk of physical loss and damage thereto and shall waive subrogation against Contractor for loss or damage which may thereafter be covered under Owner's insurance." Plaintiff urges that, under the circumstances of the instant case, a construction of this provision denying it the right to recover from defendant those damages for which it was compensated by its insurer would effectively rob it of the benefit of the section 5.3 guarantees. It is argued that the phrase "all risk" found in this section of the contract refers, in reality, solely to risk of loss due to such causes as "fire, flood or lightning." Section 8.9, plaintiff reasons, was inserted for the limited purpose of ascertaining when responsibility for obtaining insurance coverage for such risks passed to it. The provision fixes that time as the moment when care, custody and control, that is, possession, of the plant passed to plaintiff. Plaintiff argues that section 8.9 did not abrogate defendant's responsibility for loss due to design defects. Rather, under section 5.3, defendant bore the risk of loss for damages caused by such defects for a period of one year after plaintiff had formally accepted the plant.

We find plaintiff's reading of section 8.9 to be illogical. If this provision applied only to loss due to such phenomena as lightning, flood and the like, there would be no reason for a waiver of subrogation clause since it is clear that damage resulting from these causes would not be attributable to defendant. Nothing in section 8.9 bespeaks an intent to limit plaintiff's assumption of risk upon taking possession of the plant

to losses arising exclusively from fortuitous causes of this nature.[7] Rather, it appears clear that this provision was inserted in the contract in order that defendant might enjoy the benefit of plaintiff's insurance coverage. The courts of this State have recognized the validity of similar provisions. (See *Cerny-Pickas & Co. v. C. R. Jahn Co.*, 7 Ill.2d 393, 131 N.E.2d 100.) Moreover, the contract was drafted by plaintiff and, in accordance with traditional rules, should be construed strictly against it. (*Orput-Orput & Associates, Inc. v. McCarthy*, 12 Ill.App.3d 88, 298 N.E.2d 225.) We will not make for plaintiff a better agreement than that which it was satisfied to draft. (*Cf. Volid v. Volid*, 6 Ill.App.3d 386, 286 N.E.2d 42.) The plain words of section 8.9 state that plaintiff agreed to waive subrogation for loss or damage covered under its insurance. Plaintiff stipulated at trial that all direct damages caused by the repair and replacement of the converter were paid to it by its insurer. Hence the suit against defendant was in the nature of a subrogation action. Therefore, we hold that even if a breach of the section 5.3 design guarantees had been proved, the motion for a directed verdict was properly granted since section 8.9 barred plaintiff's action.[8]

Prior to trial, plaintiff filed a motion in limine to bar defendant from bringing to the attention of the jury the fact that it had received compensation from its insurer for direct damages resulting from the failure of the converter. Supporting memoranda cited the common law principle that evidence of a party's insurance coverage is inadmissible. (See *McCarthy v. Spring Valley Coal Co.*, 232 Ill. 473; *Vose v. Central Illinois Public Service Co.*, 286 Ill. 519.) Underlying this motion was plaintiff's assertion that section 8.9 was no bar to its action against defendant, and

---

[7] We note that within the insurance industry "all risk" coverage is interpreted as being broadly inclusive so that recovery will be allowed for all losses unless the policy contains a specific provision expressly excluding the loss from coverage. (See 13 Couch on Insurance § 48.138, at 596 (2d ed. 1965).) It has been held "that the very nature of the term 'all risks' must be given a broad and comprehensive meaning as to covering any loss other than a wilful or fraudulent act * * *." (*Miller v. Boston Insurance Co.*, 420 Pa. 566, 572, 218 A.2d 275, 278 (1966).) Thus, in the absence of such specific exclusions, all-risk policies have been held to allow recovery for losses caused by mechanical failures. *General American Transportation Corp. v. Sun Insurance Office, Ltd.*, 239 F.Supp. 844 (E. D. Tenn. 1965), *aff'd*, 369 F.2d 906 (6th Cir. 1966).

[8] As an additional ground for affirming its directed verdict, defendant has argued that plaintiff did not comply with the requirements of section 5.3 in that it failed to give written notice of a defect in design. In view of the fact that defendant's personnel were at the scene of the failure immediately following its occurrence and defendant's active participation in meetings and conferences leading to the decisions to repair and ultimately to replace the converter, we believe it manifest that defendant was adequately apprised of the failure and plaintiff's dissatisfaction with the vessel. We therefore reject defendant's argument.

that defendant asserted this provision as a defense only as a ploy to bring the subject of insurance before the jury. Plaintiff's motion was denied. This, plaintiff contends, was error. The prejudice resulting from this order, plaintiff asserts, is reflected by the fact that it was forced to enter into the "Stipulation Concerning Insurance" and drop a negligence count and a gross negligence count from its complaint.

> "Generally the fact that one or more of the litigants is insured is inadmissible.
>
> Such insurance generally does not adhere to the benefit of the tortfeasor." 21 Appleman, Insurance Law and Practice § 12841 (1974 Supp.).

This doctrine, first propounded in personal injury cases, "is in transition * * * and there has been established numerous exceptions and competing considerations." (*Seyferlich v. Maxwell*, 28 Ill.App.2d 469, 476, 171 N.E.2d 806.) Thus, it has come to be recognized that if the fact that a party has insurance becomes relevant to another material issue in the case, it need not be excluded. *Cf. Horst v. Morand Brothers Beverage Co.*, 96 Ill.App.2d 68, 78, 237 N.E.2d 732.

■■ In the instant case the fact that plaintiff had insurance coverage was relevant to the issues properly raised in defendant's additional defenses. For example, as we have discussed above, section 8.9 serves as a bar to subrogation actions arising out of alleged breaches of contractual guarantees. To establish this defense, defendant would have been required to prove the fact that plaintiff was insured and that its insurer had compensated it for all damages for which defendant was allegedly responsible. Obviously evidence regarding plaintiff's insurance was both relevant and necessary. Similarly, evidence regarding defendant's additional defense that plaintiff waived its right to recover for damages caused by the second failure of the converter due to plaintiff having succumbed to its insurer's urging that a field repair be attempted would have required the introduction of evidence regarding plaintiff's insurance coverage.

Further, it is our belief that under section 22(3) of the Civil Practice Act (Ill. Rev. Stat. 1971, ch. 110, par 22(3)) this action should have been brought in the name of plaintiff's insurer. Section 22(3) provides:

> "Any action hereafter brought by virtue of the subrogation provision of any contract or by virtue of subrogation by operation of law shall be brought either in the name or for the use of the subrogee; provided, the subrogee shall in his pleading on oath, or by his affidavit if pleading is not required, allege that he is the actual bona fide subrogee and set forth how and when he became subrogee."

We are cognizant of the fact that a long line of cases has established the principle that if an insured plaintiff has even a de minimus pecuniary interest in the suit, it is enough to allow a subrogation action to be maintained in his name. (See, e.g., *Byalos v. Matheson*, 328 Ill. 269, 159 N.E. 242; *Osgood v. Chicago & North Western Ry. Co.*, 253 Ill.App. 465; *Ebel v. Collins*, 47 Ill.App.2d 327, 198 N.E.2d 552.) However, it is equally clear that where the insured has no right to a recovery in excess of the subrogation claim, the interest of the subrogee cannot be concealed. "It must be either named as the plaintiff or disclosed as the real party in interest." (*Shaw v. Close*, 92 Ill.App.2d 1, 4, 235 N.E.2d 830.) In the instant case plaintiff denied all allegations with regard to its insurance coverage until it entered into the "Stipulation Concerning Insurance." That stipulation, however, established the fact of plaintiff's insurance coverage and that its insurer had compensated it for all damages it was seeking against defendant. Under section 22(3) the interest of the subrogee could not then be concealed. The court below did not err in denying plaintiff's motion in limine to prohibit all mention of its insurance coverage.

Count V of plaintiff's amended complaint alleged that defendant had breached the implied warranties imposed by the Uniform Commercial Code. (Ill. Rev. Stat. 1971, ch. 26, pars. 2—314 and 2—315.)[9] Defendant moved to strike this count, arguing that as a general contractor it was exempt from these provisions. Its position was that the contract with plaintiff was not a contract for the sale of goods but rather was a contract to render "engineering and construction services." The court granted defendant's motion. Plaintiff contends that in entering the order striking this count, the court once again erred.

Article II of the Uniform Commercial Code (Ill. Rev. Stat. 1971, ch. 26, par. 2—101 *et seq.*) applies only to the sale of goods. Section 2—106 (Ill. Rev. Stat. 1971, ch. 26, par. 2—106) defines a "contract for sale"

---

[9] Section 2—314(1) of the Uniform Commercial Code provides:

"§ 2—314. *Implied Warranty: Merchantability; Usage of Trade.*

(1) Unless excluded or modified (Section 2—316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this Section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale."

Section 2—315 of the Uniform Commercial Code provides:

"§ 2—315. *Implied Warranty: Fitness for Particular Purpose.*

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

as including both a present sale and a contract to sell goods at a future time. It defines "sale" as the passing of title from the seller to the buyer for the price of goods which they have established by their negotiation. Section 2—103(1)(d) (Ill. Rev. Stat. 1971, ch. 26, par. 2—103(1)(d)) defines the term "seller" as a "person who sells or contracts to sell goods." By implication, then, any transaction not in goods or outside of a sales transaction would not fall within the provisions of this article. See 3 Williston on Sales § 18—7, at 73 (4th ed. 1974).

Plaintiff argues that the mere fact that a contract calls for the provision of services does not remove it from the purview of the Uniform Commercial Code. It argues that in the contract in question defendant agreed to "furnish everything necessary to a complete ammonia plant." That obligation, it asserts, included the furnishing of goods, specifically the converter. Plaintiff points to several cases which have held the implied warranty provisions of the Code to be applicable to contract which in substantial part included the obligation to render services. (See, *e.g.*, *Berry v. G. D. Searle & Co.*, 56 Ill.2d 548, 309 N.E.2d 550, where the court held distribution of contraceptives by the Planned Parenthood Association, though only on ancillary adjunct to the service of giving birth control advice, was still a sale under the Code; *Worrell v. Barnes*, 87 Nev. 204, 484 P.2d 573 (1971), where the court held that the implied warranties of the Code applied to a contract for the remodeling of a home including the installation of a gas line and water heater.)[10] Plaintiff contends that in view of these cases, at the very least, it should have been afforded the opportunity to present evidence demonstrating that its contract with defendant called for the sale of goods in addition to the provision of services.

---

[10] Plaintiff has cited *Aced v. Hobbs-Sesack Plumbing Co.*, 55 Cal.2d 573, 360 P.2d 897, 12 Cal. Rptr. 257 (1961), as standing for the proposition that although the implied warranty provisions of the Sales Act, and inferentially the similar provisions of the Uniform Commercial Code, apply only to sales contracts, warranties may be implied in other contracts not covered by these statutory provisions. In *Hobbs-Sesack* the court held that a contractor's agreement to furnish "necessary labor and materials" for a radiant heating system was not a sales contract. Nevertheless, it held that there was "no justification for refusing to imply a warranty of suitability for ordinary uses" where it was shown that the system's tubing had corroded and developed leaks within a year of installation. This decision was based on the holdings of other jurisdictions that a contractor impliedly warrants his workmanship. (See, *e.g., Mann v. Clowser*, 190 Va. 887, 59 S.E.2d 78 (1950); *In re Talbott's Estate* 184 Kan. 501, 337 P.2d 986 (1959).) California, however, is apparently the only State which has held that a contractor impliedly warrants the material it uses where it has been found that no statute is applicable. (But see *Worrell.*) We have found no Illinois cases in which this proposition has been adopted. Moreover, in the case at bar plaintiff's Count V was predicated solely on the applicability of the Uniform Commercial Code and not on that of a common law warranty.

It is defendant's position that the relationship between itself and plaintiff was "carefully spelled out in the 41 page Agreement which [plaintiff] drafted." That agreement, defendant argues, called upon it only to render engineering and construction services. With regard to the procurement of the component parts of the ammonia plant, defendant asserts it was acting as plaintiff's purchasing agent. Defendant argues that its position is supported by *United States v. Akron Mechanical Contractors, Inc.*, 308 F.Supp. 496 (D. Md. 1970), and *Thomas v. Buttress & McClellan, Inc.*, 141 Cal.App.2d 812, 297 P.2d 768 (1956), in which the courts held that a contractor's agreement to construct a completed system or facility was not a contract for the sale of goods. Further support for defendant's position may be found in *Continental Illinois National Bank & Trust Co. v. National Casket Co.*, 27 Ill.App.2d 447, 455, 169 N.E.2d 853. There a contract called for the manufacture and installation of a marquee on a building. The court held that the contract was not one for the sale of goods and therefore "[t]he sections of the Sales Act cited by the plaintiff are not applicable." It is to be noted that in none of these cases was the applicability of the implied warranties provided under the Uniform Sales Act or the Uniform Commercial Code raised.

■■ We believe that to establish the nature of the relationship between plaintiff and defendant and thus to determine whether their agreement was within the purview of the Code, we must look to the text of the contract itself. The intent of the parties to a written contract must be determined solely from the language used when no ambiguity in its terms exists. (*Schek v. Chicago Transit Authority*, 42 Ill.2d 362, 247 N.E.2d 886; *Gaffney v. William J. Burns Detective Agency International, Inc.*, 12 Ill.App.3d 476, 299 N.E.2d 540.) Where the language of a contract is unambiguous and "clearly indicates that the parties entered into a contract for work, labor and materials, the courts cannot, under the guise of interpretation * * * rewrite or reform that contract as a contract to sell." *Crystal Recreation, Inc. v. Seattle Association of Credit Men*, 34 Wash.2d 553, 560-61, 209 P.2d 358, 362 (1949).

In the instant case we note that throughout the contract plaintiff is denominated "Owner" not buyer, and defendant is denominated "Contractor" not seller. The agreement expressed a desire by plaintiff to have an ammonia plant "designed, constructed and completed" by defendant, not a desire to purchase the facility from defendant. Defendant was represented as being engaged in the business of "designing and constructing" rather than selling. The agreement called for defendant to do all process, design and engineering work. It did not call for defendant to sell anything to plaintiff. With respect to the converter and other component parts, defendant was to "procure, expedite, receive, install

and erect all equipment." No mention is made of selling equipment. Defendant's sole fixed fee was to be compensation for services including "purchasing services, including the services of buyers, expediters and inspectors." Most important to our determination are two provisions found in article VIII of the contract. As noted above, section 8.2 placed ultimate control of purchasing decisions in the hands of plaintiff, not defendant. Under section 8.23 "title to all machinery and equipment and supplies for the work shall, as between Owner and Contractor, be in Owner." Thus defendant never had title to any component part of the plant, including the converter.

■■ We believe the foregoing demonstrates that the contract clearly and unambiguously was intended by the parties as one for the provision of services exclusively, not a contract of sale. Defendant's assertion that it was not a "seller of goods" is amply supported by this document. We are cognizant of the fact that pursuant to section 8.20 defendant was to be considered an "independent contractor with respect to the work to be performed" under the contract. However, the fact that defendant was an independent contractor with regard to design work and field construction activities was not incompatible with its function as buyer and procurer of materials for the use of plaintiff. Under the circumstances of this case it was unnecessary for the court to take evidence to determine that the implied warranty provisions of the Uniform Commercial Code were not applicable. It did not err in striking Count V of plaintiff's amended complaint.

For the foregoing reasons we affirm the judgment directing a verdict in favor of defendant.

Affirmed.

BARRETT and SULLIVAN, JJ., concur.