# Illinois Official Reports

## Appellate Court

---

*Developers Surety & Indemnity Co. v. Lipinski*, 2017 IL App (1st) 152658

---

| | |
|---|---|
| Appellate Court Caption | DEVELOPERS SURETY AND INDEMNITY COMPANY, an Iowa Corporation, By and Through Its Underwriting Manager and Authorized Agent, Insco Insurance Services, Inc., a California Corporation, Plaintiff-Appellant, v. MARC S. LIPINSKI, Individually; DONNELLY, LIPINSKI & HARRIS, LLC, an Illinois Limited Liability Company; and RIORDAN, DONNELLY, LIPINSKI & McKEE, LTD., an Illinois Corporation, Defendants-Appellees. |
| District & No. | First District, Second Division<br>Docket No. 1-15-2658 |
| Rule 23 order filed<br>Motion to<br>publish allowed<br>Rehearing denied<br>Opinion filed | June 30, 2017<br><br>August 18, 2017<br>August 18, 2017<br>August 22, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-L-3758; the Hon. Raymond W. Mitchell, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Grasso Bass, P.C., of Hinsdale (Gary A. Grasso and Adam R. Bowers, of counsel), for appellant. |

Donohue Brown Matthewson & Smyth, LLC, of Chicago (John J. Duffy, Karen Kies De Grand, and Michael G. Carney, of counsel), for appellees.

Panel                JUSTICE NEVILLE delivered the judgment of the court, with opinion.
Presiding Justice Hyman concurred in the judgment and opinion.
Justice Mason specially concurred, with opinion.

## OPINION

¶ 1        Developers Surety and Indemnity Company (DSI) filed a complaint for legal malpractice against Marc S. Lipinski. After years of litigation, DSI admitted that insurance had compensated it for all losses it suffered due to the alleged malpractice. DSI argued that under the collateral source rule, Lipinski should not benefit from DSI's insurance, so the insurance should not affect the award of damages. DSI admitted that it owed to its insurers all damages it recovered from Lipinski. The trial court held that the collateral source rule did not apply in legal malpractice actions. Because DSI could not prove any damages from the alleged malpractice, the court dismissed the complaint.

¶ 2        In this appeal, we hold that section 2-403 of the Code of Civil Procedure (Code) (735 ILCS 5/2-403 (West 2012)) required DSI to name its insurers, the real parties in interest, as plaintiffs. Because the plaintiffs violated section 2-403, we affirm the dismissal of the complaint.

¶ 3                                BACKGROUND
¶ 4                            The Underlying Litigation
¶ 5        The University of Chicago hired IRB Construction Partners (IRB) to act as general contractor to construct a building for the university. IRB subcontracted some of the work to F.E. Moran, Inc. (Moran), and Moran, in turn, subcontracted some of its work to 3D Industries, Inc (3D). 3D paid a premium to DSI, and DSI issued performance and payment bonds, guaranteeing to Moran, as obligee, that 3D, as principal, would complete its work.

¶ 6        In early May 2005, 3D's employees walked off the job, leaving 3D's work incomplete. DSI assigned Moran's claim on the bonds to its claims handler, Daniel Berge. DSI retained the law firm of Riordan, Donnelly, Lipinski & McKee, Ltd., as surety counsel, and Lipinski served as counsel to DSI for Moran's claim.

¶ 7        On May 25, 2005, Lipinski sent Berge an e-mail informing Berge that Moran had hired workers to complete 3D's work. DSI hired Steve Carlino as an expert to estimate the cost for completion of 3D's work. On June 2, 2005, Hal Emalfarb, attorney for Moran, sent a letter to Lipinski, saying:

> "FE Moran's initial estimate of the cost to complete the 3D Industries, Inc. work is $792,594.00 (estimate to follow). In addition the unpaid suppliers total $582,905.85 *** and the union may be owed over $100,000 for total obligations to complete 3D's

contractual obligations of $1,421,499.85[ ] against a subcontract balance of $478,496.24[ ] leaving a possible deficit estimated (to be reviewed) at $943,003.61[ ] of 3D's outstanding obligations under the bonded subcontract.

*** [D]emand is again made on the surety to pay the unpaid suppliers *** and to cash flow the labor to complete the work. ***

*** [T]he surety's failure to timely respond will be in bad faith as determining a supplier's payment bond claim should take less th[a]n an hour especially since your principal swore under oath [t]he amounts due each supplier. ***

FE Moran has been forced against its will to take over 3D's obligations to perform the bonded subcontract. Is the surety looking for a replacement contractor? Does the surety agree to fund the bonded incomplete subcontract work by consenting to placing 3D's employees and other Union laborers on its payroll? The delay in a decision is not without substantial financial harm to FE Moran."

¶ 8 Carlino estimated that Moran would need to spend about $200,000 to complete 3D's work. Because Moran had paid 3D $478,496.24 less than the amount it agreed to pay 3D if 3D completed its work, according to Carlino, 3D and DSI owed Moran nothing and Moran still owed 3D a substantial amount for the work 3D had completed before it stopped working.

¶ 9 In September 2005, 3D filed a complaint against Moran, charging Moran with breaching their contract by failing to make payments when due. 3D claimed that Moran's failure to pay left 3D with inadequate funds to pay its employees, leading 3D's employees to walk off the job.

¶ 10 Moran responded with a letter to DSI setting out its out of pocket expenses due to 3D's failure to complete its work and DSI's failure to meet its obligations under the bonds. Berge sent Moran a letter formally denying Moran's claims on the bonds in November 2005.

¶ 11 Moran answered 3D's complaint and filed a counterclaim against 3D for breach of contract and fraud. Moran added a third-party claim against DSI for failure to fulfill its duties as surety and for acting in bad faith when it denied Moran's claims. Moran's attorney drafted a settlement agreement in November 2005. The parties did not reach a settlement at that time. DSI and Moran engaged in extensive discovery and trial preparation from 2005 through 2009.

¶ 12 In 2010, DSI's general counsel decided to bring in another law firm to help with preparing 3D Industries, Inc. v. F.E. Moran, Inc., No. 05-CH-15386 (Cir. Ct. Cook Co.) (3D v. Moran), for trial. The new law firm, Tressler LLP, prepared an extended report, dated June 2010, explaining its analysis of the litigation. According to Tressler, 3D had very weak evidence to support its claim that Moran breached the contract. Moran had strong evidence that 3D breached the contract, and Moran had strong support for almost all of its settlement demand for about $5 million. Tressler also found that "there is a risk that Moran may prevail against [DSI] under the statutory bad faith count. *** [DSI] may have difficulty [proving] that, to the extent it relied on Carlino's report, that such reliance was justified or at least not misplaced." Tressler recommended an "aggressive settlement strategy," with "the settlement range of this matter to be in the area $3,500,000-$4,000,000."

¶ 13 In August and September 2010, DSI, Moran, and other affected parties settled all the claims in 3D v. Moran. DSI paid Moran $3.7 million.

¶ 14                                    Legal Malpractice Litigation

¶ 15        On April 6, 2012, DSI filed a complaint for legal malpractice, naming as defendants (1) Lipinski; (2) the law firm of Riordan, Donnelly, Lipinski & McKee, Ltd.; and (3) the law firm of Donnelly, Lipinski & Harris, LLC, for whom Lipinski worked in 2010. DSI alleged that Lipinski breached his duties as an attorney and that, because of Lipinski's failures, DSI lost the opportunity to settle *3D v. Moran* in 2005 at a price far less than the $3.7 million DSI eventually paid.

¶ 16        Lipinski asked in discovery for information concerning DSI's recovery from reinsurers for the payments it made in *3D v. Moran*. DSI answered, "This interrogatory is not intended to lead to the discovery of admissible evidence. Pursuant to the collateral source rule, contributions by reinsurance or other entities are not discoverable." The trial court ordered DSI to answer the interrogatory while expressly leaving unresolved the issue of whether DSI could recover from Lipinski amounts covered by reinsurance. DSI answered:

> "[DSI] paid $4,773,292.23: of this amount, the total loss was $3,985,415.16, plus expenses of $787,877.07. CHUBB paid $99,160.01 under an E&O policy; Munich Re paid $2,200,000 under a reinsurance policy; Endurance Re paid $602,754.04 under a reinsurance policy."

¶ 17        Thus, DSI admitted that an insurer and two reinsurers had paid a total of $2,901,914.05 of the total settlement plus costs, leaving DSI with unreimbursed damages of $1,871,378.18.

¶ 18        The parties engaged in extensive pretrial discovery, including dozens of depositions and hundreds of interrogatories. DSI's experts said that Lipinski breached his duties by relying on Carlino's opinion when Carlino had not shown adequate support for that opinion. DSI's experts said that Lipinski had a duty to advise DSI to make a substantial settlement offer in 2005.

¶ 19        The trial court assigned a trial date of August 2015. Lipinski filed a timely motion for summary judgment, arguing that the depositions showed that DSI could not prove that the parties would have reached a settlement in 2005 but for Lipinski's alleged errors and therefore DSI could not prove the proximate cause element of its cause of action. The trial court denied the motion for summary judgment.

¶ 20        In August 2015, both parties filed numerous motions *in limine*. Both parties recognized the significance of the unresolved issue of whether the collateral source rule applied and left Lipinski liable for all damages due to the alleged malpractice, even though insurers had already reimbursed DSI for much of its loss. DSI filed a motion *in limine* to bar evidence of its insurance coverage; Lipinski filed a motion *in limine* to bar DSI from recovering as damages amounts covered by CHUBB and the two reinsurers.

¶ 21        On September 1, 2015, the trial court held that the collateral source rule did not apply in legal malpractice actions and therefore Lipinski could present evidence of DSI's recovery from CHUBB and the reinsurers and use that recovery to offset any damages awarded to DSI. DSI filed a motion to reconsider. It attached to the motion its two reinsurance contracts. The contracts included the following clause:

> "[DSI] agrees to enforce its rights of salvage and subrogation by taking whatever action is necessary to recover its loss from *** any other party who caused or contributed to its loss or part thereof."

¶ 22    At oral argument on the motion to reconsider, counsel for DSI informed the court that "100 percent of the plaintiff's provable damages are covered by reinsurance." Counsel explained that DSI admitted that if it had settled *3D v. Moran*, it would have paid to Moran an amount exceeding the amount left unreimbursed by reinsurers and CHUBB. Counsel said that if the trial court denied the motion to reconsider the ruling on reinsurance, DSI "would not be able to prove its damage element." Lipinski moved to dismiss the complaint with prejudice. On September 3, 2015, the trial court entered an order dismissing the complaint with prejudice.

¶ 23    In October 2015, DSI filed a motion to amend the complaint. In the proposed amended complaint, DSI sought to add a count for subrogation, alleging:

> "[DSI], pursuant to the terms of the Reinsurance, is obligated to 'enforce its rights of salvage and subrogation' on behalf of Endurance Re and Munich Re.
>
> * * *
>
> *** [P]ursuant to the law of subrogation in Illinois, [DSI] has the right to recover on behalf of the Reinsurance the amounts paid in satisfaction of the underlying claims, and pursuant to the Reinsurance Treaties themselves, [DSI] has a contractual obligation to seek a recovery from Defendants for amounts paid by Reinsurance."

¶ 24    The trial court denied the motion to reconsider and the motion for leave to amend "because it would be futile." DSI filed a timely notice of appeal.

¶ 25                                    ANALYSIS

¶ 26    DSI argues on appeal that the collateral source rule does not apply because the reinsurers do not count as collateral sources. Lipinski argues that the trial court correctly applied the legal malpractice exception to the collateral source rule. In the alternative, Lipinski argues that this court should affirm the trial court's judgment on grounds advanced in Lipinski's unsuccessful motion for summary judgment, that DSI cannot prove the proximate cause element of its malpractice claim.

¶ 27    We agree with Lipinski that this court has authority to "affirm a trial court's judgment on any grounds which the record supports even if those grounds were not argued by the parties." *In re Detention of Stanbridge*, 2012 IL 112337, ¶ 74. We find a problem with the complaint.

¶ 28    Section 2-403(c) of the Code (735 ILCS 5/2-403(c) (West 2012)) provides, "Any action hereafter brought by virtue of the subrogation provision of any contract or by virtue of subrogation by operation of law shall be brought either in the name or for the use of the subrogee."

¶ 29    In *Shaw v. Close*, 92 Ill. App. 2d 1, 4 (1968), the court explained:

> "This statute simply means that the interest of a subrogee cannot be concealed in any proceeding brought for its benefit. It must be either named as the plaintiff or disclosed as the real party in interest. Such is the situation in the case at hand. *** The present action, therefore, had to be brought in the name of the subrogee itself or in the name of the plaintiff for the use of the subrogee. Since it was not, it contravened the statute."

¶ 30    In *Gadson v. Among Friends Adult Day Care, Inc.*, 2015 IL App (1st) 141967, the appellate court applied *Shaw* to a case involving an insurer's subrogation to the rights of its insured. The *Gadson* court said, "under section 2-403(c), where the insurer-subrogee is the only remaining real party-in-interest to the subrogation action because the pecuniary interest of

the insured has been fully satisfied, the insurer-subrogee is required to file the action in its own name." *Id.* ¶ 28 See also *Prudential Insurance Co. v. Romanelli*, 243 Ill. App. 3d 246, 250 (1993); *Nitrin, Inc. v. Bethlehem Steel Corp.*, 35 Ill. App. 3d 577, 592 (1976).

¶ 31    DSI admitted that its reinsurers and CHUBB covered all of the damages it suffered due to Lipinski's malpractice. Therefore, section 2-403(c) required the reinsurers and CHUBB to file the complaint against Lipinski in their own name or by DSI "for the use of" the reinsurers and CHUBB. Even in the proposed amended complaint, the plaintiffs have failed to comply with section 2-403(c). Accordingly, we affirm the dismissal of the complaint.

¶ 32                                        CONCLUSION

¶ 33    The reinsurers and CHUBB did not comply with section 2-403(c) of the Code when they failed to file a complaint against Lipinski in their own name. Therefore, the trial court did not err when it dismissed the complaint.

¶ 34    Affirmed.

¶ 35    JUSTICE MASON, specially concurring.

¶ 36    I concur in the majority's decision to affirm dismissal of DSI's complaint. I write specially to address the substantive issue raised by the parties on appeal: whether the collateral source rule applies in a legal malpractice case when the former client has been fully compensated through insurance (in this case reinsurance) but the client has an obligation to repay the collateral source in the event and to the extent of a recovery against the lawyer, thus potentially precluding a double recovery. The majority finds it is unnecessary to address this issue given its focus on a procedural issue it finds dispositive, *i.e.*, that the real gravamen of DSI's complaint was a subrogation action in which DSI's reinsurers were the real parties in interest and who, under section 2-403(c) of the Code of Civil Procedure (735 ILCS 5/2-403(c) (West 2012)), were required to be disclosed as such in DSI's complaint.[1] Although I agree this is the correct result, I believe it is necessary to address more of the parties' contentions in order to understand why.

¶ 37    DSI had an attorney-client relationship with defendants and claimed that defendants committed malpractice when, during a relatively brief window of opportunity in the underlying case, they failed to settle the claim against DSI for $1.1 million, far less than the $3.7 million DSI ultimately paid. As damages, DSI sought the difference between the amount it claimed the underlying case could have been settled for in 2005 and the amount it eventually settled for in 2010. Although not necessary to resolution of this appeal, suffice to say that the evidence of defendants' ability to affect a $1.1 million settlement among all parties in interest in 2005 was less than compelling.

¶ 38    When defendants sought discovery of amounts paid by DSI's reinsurers, DSI strenuously resisted those requests, which were the subject of extensive motion practice. DSI contended that defendants were not entitled to discover amounts paid by third parties since the collateral

---

[1]Since a legal malpractice claim cannot be assigned (*Learning Curve International, Inc. v. Seyfarth Shaw LLP*, 392 Ill. App. 3d 1068, 1074 (2009)), DSI's only viable option under section 2-403(c) was to bring the action in its own name "for the use of" its reinsurers.

source rule would preclude admission of that evidence at trial. See *Muryani v. Turn Verein Frisch-Auf*, 308 Ill. App. 3d 213, 215 (1999) (collateral source rule holds that benefits received by the injured party from source independent of the tortfeasor will not diminish otherwise recoverable damages); see also *Wills v. Foster*, 372 Ill. App. 3d 670, 673 (2007) ("The rationale for the rule is that the defendant should not be allowed to benefit from the plaintiff's foresight in acquiring insurance.").

¶ 39　　　Defendants, citing *Sterling Radio Stations, Inc. v. Weinstine*, 328 Ill. App. 3d 58 (2002), argued that, as a blanket proposition, the collateral source rule does not apply in legal malpractice cases. In *Sterling Radio*, this court found that a legal malpractice plaintiff whose corporation reimbursed him for a judgment against him in the underlying case could not seek the judgment amount as damages in a later legal malpractice action. *Id.* at 65 ("Here, Seith personally paid nothing in satisfaction of the judgment rendered against him *** as a result of defendants' malpractice. Therefore, his measure of damages is zero."). DSI sought to distinguish *Sterling Radio* on the ground that in the context of this case, where the terms of the reinsurance contracts required DSI to pursue third parties responsible for the loss and, if successful, reimburse the reinsurers to the extent of any recovery, there was no possibility of a windfall recovery to DSI and, therefore, the collateral source rule should apply.

¶ 40　　　DSI eventually disclosed the payments from its reinsurers and was ultimately compelled, on the eve of trial, to admit that all of the amounts it had paid to settle the underlying case had been reimbursed pursuant to reinsurance agreements. DSI argued that despite this fact, it could still recover the difference in settlement amounts as damages given its contractual obligation to reimburse its reinsurers and so the jury should not hear evidence of the reinsurers' payments. The trial court, interpreting *Sterling Radio* as a categorical limitation on the applicability of the collateral source rule in legal malpractice cases, acknowledged the potential merit in DSI's argument but felt compelled to follow *Sterling*'s holding. Because the remaining amount of DSI's alleged damages[2] would not warrant the extended jury trial the parties contemplated, DSI ultimately dismissed its complaint.

¶ 41　　　On October 5, 2015, 3½ years after it filed this case, DSI sought leave to file an amended pleading asserting a subrogation claim, which still failed to name its reinsurers as the real parties in interest. 735 ILCS 5/2-403(c) (West 2012) (requiring action to be brought "either in the name or for the use of the subrogee"). The trial court denied leave to amend as untimely.

¶ 42　　　Throughout this protracted litigation, DSI has denied that this was a subrogation action on behalf of its reinsurers. DSI obviously sought to prevent the jury in this case from hearing any evidence regarding payments received from its reinsurers for the obvious reason that a jury's sympathy for a legal malpractice victim would likely be tempered by the knowledge that the victim's losses had been covered by a third party, albeit one the victim was obligated to repay. And while I believe DSI's effort to distinguish *Sterling* may well have been meritorious given the focus of *Sterling*'s reasoning—the prevention of a windfall recovery by the malpractice plaintiff—DSI was nonetheless not entitled to mislead the jury by pretending that it had not been reimbursed for the pecuniary loss it sustained in connection with settlement of the underlying case. That is what the subrogation provisions of the Code of Civil Procedure

---

[2]DSI identified its self-insured retention of $500,000 as an element of damage, a position that ignores that DSI would have had to pay that amount if the case settled in 2005 for $1.1 million, as DSI claimed it should have.

prevent. And it follows that DSI was not entitled to present to the jury a theory of damages that depended on the untrue assumption that it had not been reimbursed for its losses, which was the only theory of damages DSI advanced.[3]

¶ 43     So the majority correctly concludes that DSI was required under section 2-403 to disclose the real parties in interest in this case—its reinsurers. And because DSI waited until after defendants' motion *in limine* had been granted and after the case had been dismissed to seek leave to do what it should have done in the first case—pursue a subrogation action—the trial court correctly exercised its discretion to deny that long overdue amendment, which, as the majority points out, still did not cure the failure to name the real parties in interest.

---

[3]DSI was only obligated to reimburse its reinsurers for any recovery it obtained against defendants. To the extent DSI recovered as damages less than what the reinsurers paid, DSI has pointed to no contractual obligation that required it to make up the difference through a lump sum payment. Rather, under the terms of the reinsurance agreements, DSI would have reimbursed the reinsurance pool—either through increased premiums or other means—over time. Thus, any viable damage theory would have had to take into account the time value of money—DSI was reimbursed under its reinsurance contracts long before trial—and would have necessarily addressed the complicated calculation of DSI's damages based on its future obligation to reimburse the reinsurance pool for any shortfall through increased premiums, retrospective rate calculations, or some other method.