Beverly J. **BRANDON**, Appellee,

v.

**WEST BEND MUTUAL INSURANCE COMPANY**, Appellant.

No. 02–1880.

Supreme Court of Iowa.

June 16, 2004.

Peter J. Thill and Lisa Taylor of Betty, Neuman & McMahon, L.L.P., Davenport, for appellant.

Michael J. Walton and Robert L. Cusack of Ottesen & Walton, Davenport, for appellee.

WIGGINS, Justice.

In this interlocutory appeal, the primary issue presented is whether an insured who has brought an action against an insurer for uninsured and underinsured motorist benefits may discover privileged communications between outside counsel employed by the insurer to pursue its subrogation interests against the underinsured driver and the insurer's claims adjuster and in-house counsel, made in the course of the prior litigation against the underinsured driver, on the basis of the joint-client exception to the attorney-client privilege and the work product doctrine. On our review, we affirm the decision of the district court to permit discovery by deposition but limit the scope of discovery to (1) communications between outside counsel and the insurer's claims adjuster during the period of joint representation; and (2) communications between outside counsel and the insurer's in-house counsel during the period of joint representation.

## I. Background Facts and Proceedings.

The background facts of this case date back to May 23, 1999, when Beverly Brandon (Brandon) was injured as a result of a collision between an automobile driven by Juan Castillo (Castillo) and an automobile driven by Mark Schultz (Schultz). Brandon was a passenger in the Castillo vehicle. The accident occurred at an intersection of two roads in Edgington Township, Illinois.

Castillo's vehicle was uninsured. Drivers Direct Auto Insurance (Drivers Direct) insured Schultz with an automobile insurance policy with limits of $20,000. West Bend Mutual Insurance Company (West Bend) provided Brandon with uninsured motorist coverage (UM) and underinsured motorist coverage (UIM) with limits of $300,000. The policy also provided Brandon with $5000 medical payment coverage.

Brandon made a claim against West Bend under the UM/UIM provisions of the policy for her injuries. West Bend paid Brandon $5000 under the medical payment provision of the policy and eventually offered to settle her UM/UIM claim for $120,000. On September 8, 2000, West Bend notified Drivers Direct of its subrogation interest.

Brandon subsequently obtained the services of an attorney, who rejected West Bend's offer. Instead, he demanded the policy limits. In a letter dated March 7, 2001, Brandon's counsel informed West Bend that Brandon did not intend to pursue a claim against Schultz, and indicated West Bend should bring the action against him "through its subrogation rights." He also indicated Brandon would cooperate with West Bend if it brought a subrogation claim against Schultz.

West Bend subsequently employed attorney Peter J. Thill (Thill) to file a subrogation action against Schultz. On May 19, 2001, Thill filed a petition against Schultz in Illinois for the injuries sustained by Brandon. Brandon was the named plaintiff. The petition recited in two separate places that Thill was Brandon's attorney. The prayer of the petition did not limit Brandon's damage claim to the $5000 medical payment made by West Bend to Brandon but prayed for damages in excess of $50,000. Thill sent a copy of the petition to Brandon's counsel, together with a cover letter indicating he filed the petition to protect West Bend's subrogation interests.

Brandon and West Bend were unable to settle the UM/UIM claim, and Brandon filed a petition against West Bend on May 22, 2001. Thill filed an answer on behalf of West Bend. In May 2002 the Illinois action filed against Schultz settled without the necessity of Thill having to have any contact with Brandon. Schultz's insurer, Drivers Direct, agreed to pay the policy limits of $20,000 upon the filing of a release signed by Brandon.

West Bend refused to give the $20,000 it collected in the Illinois suit to Brandon. Brandon filed a motion to adjudicate law points in this action alleging as a matter of law West Bend was not entitled to the $20,000. The district court concluded West Bend was not entitled to the $20,000 it collected in the Illinois suit until Brandon was fully compensated for her injuries. The district court indicated Brandon's damages appeared to be in excess of $50,000 and ordered West Bend to remit the settlement funds immediately to Brandon. The district court reserved the issue of whether West Bend was entitled to a credit for the $5000 medical payment it made and for the $20,000 Brandon received from Schultz until after the trial, when the total amount of Brandon's damages would finally be determined. After receiving this ruling, Brandon amended her petition to assert a claim against West Bend for bad faith for West Bend's refusal to pay her the $20,000 it received from Schultz. The district court severed this claim from the UM/UIM claim.

During the course of the litigation between Brandon and West Bend, Brandon propounded interrogatories, requests for admissions, and sought the production of documents. West Bend objected to some of the admissions and the production requests. It provided answers to some of

the interrogatories, and indicated Julie Schocker (Schocker), a claims adjuster for West Bend, compiled the answers. Therese Sizer (Sizer), in-house counsel for West Bend, signed the verification to the interrogatories.

The parties resolved most of their discovery disputes generated by the requests for admissions, interrogatories, and production requests. Brandon then sought to depose Schocker and Sizer and made other requests for discovery. West Bend objected to the depositions, claiming any relevant information it possessed was not subject to discovery under the attorney-client privilege and the work product doctrine. In particular, West Bend asserted that Schocker's investigation of the claim by Brandon was protected as work product, and Brandon had made no assertion of substantial need or undue hardship for the information. It claimed all information acquired by Sizer about the case was not only protected as work product, but fell within the attorney-client privilege.

Brandon argued that any information shared between Thill and the two West Bend employees was not privileged as to her because Thill also represented her in the Illinois lawsuit. Consequently, she asserted that she was entitled to the information provided by Schocker and Sizer to Thill prior to and during the course of the Illinois litigation. She argued they gathered such information on her behalf, as well as on behalf of West Bend. Brandon also argued that West Bend waived any privilege by having Schocker and Sizer verify and answer the interrogatories.

The district court denied protective relief sought by West Bend, granted the discovery request, and ordered the depositions to be taken prior to trial. West Bend sought permission to appeal prior to a final judgment. We granted the request.

## II. Scope of Review.

 We review a discovery ruling for an abuse of discretion. *Ashmead v. Harris*, 336 N.W.2d 197, 199 (Iowa 1983). The district court ruling will be upheld unless it is clearly unreasonable or untenable. *Id.* A discovery order "is untenable when it is not supported by substantial evidence...." *Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000). A ruling based on an erroneous interpretation of a rule of discovery may constitute an abuse of discretion. *See Schaffer v. Rogers*, 362 N.W.2d 552, 555 (Iowa 1985).

## III. Issues Presented.

West Bend limits its challenge to the discovery order by the district court by only asking that the order compelling the depositions of Schocker and Sizer be reversed. Brandon acknowledges the existence of the attorney-client privilege and the work product doctrine, but claims these doctrines do not apply in a controversy between two parties who were jointly represented by the same attorney in a prior action with respect to communications with that attorney. She also claims the adjuster and in-house counsel waived any attorney-client privilege by verifying and answering the interrogatories. Thus, the issues we address on this interlocutory appeal are limited to the grounds urged by the parties.[1]

1. The positions taken by the parties narrow our consideration of the discovery dispute. We do not consider whether any nonprivileged information known by the in-house counsel or the claims adjuster would be discoverable upon a showing of substantial need and inability to obtain the information by other means under Iowa Rule of Civil Procedure 1.503(3), or by any other theory. Additionally, we do not address the procedure employed by West Bend to raise the issue presented in this interlocutory appeal since it

## IV. Attorney–Client Privilege.

██ The attorney-client privilege protects against the disclosure of " '[a]ny confidential communication between an attorney and the attorney's client ... against the will of the client.' " *Squealer Feeds v. Pickering*, 530 N.W.2d 678, 684 (Iowa 1995) (citation omitted). Under common law we recognized the privilege, and it is codified in Iowa Code section 622.10 (2001). *See Squealer Feeds*, 530 N.W.2d at 684. It is recognized that in-house counsel who consult with outside counsel fall within the privilege. 1 Paul R. Rice, *Attorney–Client Privilege in United States* § 4.4, at 24–25 (2d ed.1999).

## V. Joint–Client Exception.

██ Only a few exceptions have been carved from the attorney-client privilege. *See Hickman v. Taylor*, 329 U.S. 495, 511, 67 S.Ct. 385, 393–94, 91 L.Ed. 451, 462 (1947) (recognizing that exceptions tend to have a detrimental effect on attorney advocacy). One such exception exists where two or more persons jointly consult with the same attorney to act for them in a matter of common interest. *See City of Coralville v. Iowa Dist. Ct.*, 634 N.W.2d 675, 677–78 (Iowa 2001). This exception is known as the "joint-client" exception. Actual consultation by both clients with the attorney is not a prerequisite to the application of the joint-client exception. *Id.* at 677–78. The attorney is duty-bound to divulge such communications by one joint client to the other joint client. *Id.* Thus, when the same attorney acts for two parties, the communications are privileged from third persons in the controversy, but not in a subsequent controversy between the two parties. 1 John W. Strong,

*McCormick on Evidence* § 91, at 365–66 (5th ed.1999).

██ We recognize this exception extends to situations where the same attorney represents two parties, separately interested in a matter of common interest. *City of Coralville*, 634 N.W.2d at 677–78; *Henke v. Iowa Home Mut. Cas. Co.*, 249 Iowa 614, 619, 87 N.W.2d 920, 924 (1958) (holding attorney-client privilege does not exist because the attorney has a duty under the circumstances to divulge communications from one client to the other). The rationale for the joint-client exception "is simply that if it appears the secret or imparted communication is such that the attorney is under a duty to divulge it for the protection of the others he has undertaken to represent in the involved transaction, then the communication is not privileged." *Henke*, 249 Iowa at 619, 87 N.W.2d at 924.

On two prior occasions, we have permitted discovery of communications between an attorney and a client under the joint-client exception. In *Henke*, we held that communications between an automobile liability insurer and an attorney employed by the insurer to defend the insured in litigation resulting from an automobile accident were not privileged in a subsequent action by the insured against the insurer for bad faith and negligence in failing to settle the underlying litigation within the policy limits. 249 Iowa at 619, 87 N.W.2d at 924. More recently, in *City of Coralville*, we held that communications between city officials and an attorney retained by the city to defend the city and a police officer in an action for damages arising out of an arrest were not privileged in a later action by the police officer

was not challenged in the district court. Finally, we do not address Brandon's claim on appeal that a letter written by the in-house counsel to Drivers Direct constituted admis-

sions and a waiver of any privilege. This issue was not adequately raised on appeal and was not supported by any authorities. *See* Iowa R.App. P. 6.14(1)(*c* ).

against the city arising out of the settlement of the first action after that point in time where the facts revealed an attorney-client relationship formed between the attorney and the police officer. 634 N.W.2d at 679. Brandon relies on these cases to support her claim for discovery in this case. She claims she formed an attorney-client relationship with Thill once he filed the Illinois lawsuit in her name.

When an attorney enters an appearance in court on behalf of another, we presume an attorney-client relationship exists between the attorney and the person on whose behalf the attorney enters the appearance. *See Henke,* 249 Iowa at 617, 87 N.W.2d at 923. We recognize this presumption because an attorney has no right to bring an action on behalf of an individual without authorization. By bringing an action, the attorney subjects the client to sanctions, counterclaims, discovery requests, and a judgment for costs if the suit is unsuccessful. Additionally, under Illinois law, where Thill filed Brandon's tort suit, it is unethical and illegal for an attorney to bring an action on behalf of an individual if there is no attorney-client relationship. *Foley v. Metro. Sanitary Dist.,* 213 Ill.App.3d 344, 157 Ill.Dec. 514, 572 N.E.2d 978, 984 (1991). We assume an attorney is acting ethically and legally when an attorney brings an action on behalf of an individual and therefore a presumption that an attorney-client relationship exists is warranted.

A party may rebut the presumption of an attorney-client relationship by evidence that the client did not assent to the filing of the action. *See Henke,* 249 Iowa at 617–18, 87 N.W.2d at 923. Although it is critical that there be an undertaking by the lawyer to represent the purported client, it is equally important that there be an acceptance of the lawyer's services by the alleged client. *See Henke,*

249 Iowa at 617, 87 N.W.2d at 923; *City of Coralville,* 634 N.W.2d at 679. Further, although "[t]he fact that another selects and pays [the] attorney" is a factor in determining the existence of an attorney-client relationship, this circumstance does not prevent the formation of such a relationship. *Henke,* 249 Iowa at 617, 87 N.W.2d at 923; *accord City of Coralville,* 634 N.W.2d at 679. Applying this law to the facts and circumstances of the present case, we conclude there was substantial evidence to support the trial court's conclusion there was an attorney-client relationship between Thill and Brandon.

In a letter dated March 7, 2001, Brandon's counsel informed West Bend that neither Brandon nor her counsel intended to pursue a claim against the tortfeasor and authorized West Bend to bring the action against the tortfeasor to protect its subrogation rights. West Bend and Thill knew under Illinois law that such an action had to be brought in Brandon's name. Instead of hiring other counsel, which would have preserved West Bend's attorney-client privilege, West Bend hired Thill to file the subrogation action in Brandon's name. On May 9, 2001, Thill informed Brandon's attorney that West Bend filed an action in Illinois naming Brandon as the plaintiff.

Not only did Brandon assent to the representation by Thill in her attorney's letter of March 7, 2001, Brandon's insurance policy contractually required Brandon to assent to the representation. Part F of the insurance policy issued by West Bend to Brandon provided:

Our right to recover payment

A. If we make a payment under this coverage form and the person to or for whom payment was made has a right to recover damages from another we shall be subrogated to that right. That person shall do:

1. whatever is necessary to enable us to exercise our right.

The facts of the present case are not much different from the facts in *City of Coralville*, 634 N.W.2d 675. In *City of Coralville*, the city and one of its police officers were sued under 42 U.S.C. § 1983 and common law for damages allegedly arising out of an arrest made by a police officer. 634 N.W.2d at 676. The city authorized an attorney to file an appearance on behalf of the officer in order to avoid a default judgment. *Id.* at 676–77. The assistant city attorney informed the officer that the city had a legal obligation to provide a defense to the officer. *Id.* at 676. The officer never consulted with the attorney who appeared on the officer's behalf. *Id.* at 679. The officer was unaware that the attorney filed the appearance. *Id.* Under these circumstances, we found an attorney-client relationship existed between the attorney and the officer because the city informed the officer that the city had an obligation to defend the officer, and the attorney did in fact represent the officer by filing two appearances and motions. *Id.*

In the present case, Brandon's attorney acknowledged West Bend's subrogation rights and authorized West Bend to pursue those rights. The insurance policy contractually obligated Brandon to assent to the representation. Thill undertook that representation by filing an action naming Brandon as plaintiff. These facts will not allow West Bend to rebut the attorney-client relationship presumed by Thill's act of filing the subrogation claim in Brandon's name.

It is equally clear from the record that Brandon and West Bend did maintain a "common interest" in the Illinois action. In *Henke*, we noted a common interest exists where two or more parties consulted an attorney for the mutual benefit of the parties. 249 Iowa at 618, 87 N.W.2d at 923. In *City of Coralville*, we characterized a common interest as two or more parties having an interest in some problem or situation. 634 N.W.2d at 677. At the time Thill filed the Illinois action in Brandon's name, West Bend claims Thill filed the action solely to protect West Bend's subrogation interest and not Brandon's interest. It points to the fact that Thill settled the Illinois case without Brandon's active participation. The flaw in this argument is that West Bend did not have an interest in the proceeds from the Illinois action until Brandon received full compensation for her damages under the full recovery rule governing UIM coverage.

Iowa Code section 516A.4 gives West Bend the right of reimbursement from or subrogation to Brandon's recovery from the underinsured tortfeasor. Iowa Code § 516A.4 (2001). The right of reimbursement is limited by the goal of underinsurance, which is to fully compensate the insured for his or her damages. *McClure v. Northland Ins. Cos.*, 424 N.W.2d 448, 450 (Iowa 1988). The full recovery rule requires that the insurance company's claim for reimbursement does not mature until the insured has been fully compensated for his or her damages. *Cont'l W. Ins. Co. v. Krebill*, 492 N.W.2d 405, 406–07 (Iowa 1992).

At the time Thill filed the Illinois action, Brandon was entitled to receive Schultz's $20,000 in addition to the $5000 medical payment she previously received from West Bend because she had not yet been fully compensated for her damages. If at a later time it is determined that Brandon's damages exceed $325,000, Brandon would be entitled to the underinsured motorist limits ($300,000), the $5000 medical payment, and the $20,000 proceeds from the Illinois lawsuit under the full recovery rule. On the other hand, if at a later time

it is determined that Brandon's damages are less than $325,000, West Bend would be entitled to reimbursement from Brandon for the $5000 medical payment it made and/or from the Illinois settlement proceeds she received in an amount equal to the excess she recovered for her damages.[2]

At the time Thill filed suit in Illinois, West Bend took the position Brandon's damages were less than West Bend's underinsured limits; therefore, it claimed it was entitled to any settlement proceeds recovered in the Illinois action. At that point in the controversy, Brandon claimed her damages exceeded West Bend's UIM limits. West Bend's argument overlooks that if it is ultimately determined Brandon's damages exceeded $325,000, West Bend would not be entitled to any of the Illinois settlement proceeds. Until Brandon's damages are finally determined in the UIM action, West Bend's right of reimbursement remains unknown. Because West Bend's right of reimbursement was unknown at the time Thill filed the Illinois action, Thill's representation of Brandon in the Illinois action was for the mutual benefit of Brandon and West Bend, who had a common interest in a recovery against Schultz. Therefore, communications with Thill during the period of joint representation are subject to the joint-client exception to the attorney-client privilege and the work product doctrine.

## VI. Waiver.

Brandon claims West Bend waived the attorney-client privilege because Sizer verified the answers to the interrogatories and because Sizer and Schocker provided the information for the answers to the interrogatories. "[T]he at-

torney-client privilege may be waived." *Squealer Feeds,* 530 N.W.2d at 684. The waiver may be express or implied. *Id.* It may be based not only on words expressing intent to waive, but conduct making it unfair for a client to invoke the privilege. 1 *McCormick* § 93, at 371. Thus, we recognize waiver occurs when a person holding a privilege discloses or, for purposes of discovery, plans to disclose privileged matters. *See Squealer Feeds,* 530 N.W.2d at 684–85.

We reject the notion that a person waives a privilege by verifying the accuracy of answers to interrogatories or by participating in framing the answers. *See Travelers Ins. Cos. v. Superior Ct.,* 143 Cal.App.3d 436, 191 Cal.Rptr. 871, 876 (1983) (holding attorney-client privilege not waived by signing answers to interrogatories). A verification of the accuracy of interrogatory answers is unrelated to the concept of waiver. Instead, the determinative factor rests with the actual content of the answers provided to the interrogatories. If the answers reveal privileged communications, then waiver can occur. *See Alpha Beta Co. v. Superior Ct.,* 157 Cal.App.3d 818, 203 Cal.Rptr. 752, 759 (1984). If not, a person does not waive an attorney-client privilege by answering interrogatories in the course of the discovery phase of a trial that do not reveal any attorney-client communications. *See id.*

Brandon has not identified any answers to the interrogatories that would constitute attorney-client communications so as to justify further discovery. We find nothing in the answers to interrogatories to support waiver of the attorney-client privilege. Therefore, Brandon's inquiry at the depo-

2. Under the terms of West Bend's policy, if it is determined that West Bend does in fact have a right of reimbursement, West Bend would reduce the amount it was required to pay Brandon under the UIM coverage in an amount equal to the reimbursement Brandon owed to West Bend.

sitions should be limited to events that occurred in the period of joint representation.

## VII. Scope of Allowable Discovery.

■ The waiver of the attorney-client privilege under the joint-client exception applies only to the period when the attorney is representing both parties. *Coralville*, 634 N.W.2d at 680. The waiver applies to communications between joint clients and their attorney. *Henke*, 249 Iowa at 617, 87 N.W.2d at 923. Therefore, the scope of discovery by Brandon shall be limited to the period of joint representation. The joint representation commenced when Thill began his preparations for filing the Illinois action and ended when Brandon returned the signed release to Thill. Discovery shall also be limited to communications made by Schocker to Thill or by Sizer to Thill. West Bend has not waived the attorney-client privilege concerning any communications between Sizer and Schocker. All communications between Sizer and Schocker, which were not communicated to Thill during the joint representation, are still subject to the attorney-client privilege.

## VIII. Conclusion.

The district court did not abuse its discretion in ordering the depositions to take place. However, the district court did abuse its discretion by not limiting the inquiry by Brandon to (1) communications between Thill and Schocker during the period of joint representation; and (2) communications between Thill and Sizer during the period of joint representation. We remand the case for further proceedings consistent with this opinion.

**AFFIRMED AS MODIFIED AND CASE REMANDED.**

All justices concur except CARTER, J., who concurs specially, and CADY, J., who dissents.

CARTER, Justice (concurring specially).

This is a discovery dispute involving Iowa Rule of Civil Procedure 1.503(3). I concur with the majority's conclusion that Beverly Brandon's request for discovery should have been allowed but not for the reasons set forth in the opinion of the court. I agree with Justice Cady that Betty, Neuman & McMann, L.L.P. had no reason to believe that that firm or any member thereof had an attorney-client relationship with Beverly Brandon with regard to their pursuit of the subrogation action. Her lack of interest in that action had been expressly confirmed by another attorney who was representing her interests.

I am satisfied, however, that the protection against discovery of work product contained in rule 1.503(3) should not be applied in the present case where the actions of the parties in creating the work product are among the issues in the litigation.

CADY, Justice (dissenting).

I respectfully dissent. The legal theories that should control the resolution of the critical and delicate issue presented in this case are absent from the analysis adopted by the majority. Consequently, many dangerous traps are set by the majority opinion that will snare unsuspecting attorneys and clients—as done in this case—and unnecessarily erode one of the most noble and venerable principles of our legal system.

The attorney-client privilege is recognized as one of the pillars of our system of justice. Over the centuries, only a few carefully crafted exceptions have surfaced. *See Hickman*, 329 U.S. at 510–12, 67 S.Ct. at 393–94, 91 L.Ed. at 462–63. These

exceptions have been limited due to the detrimental effect they have on attorney advocacy. *See id.*

One exception, now widely recognized, exists when two or more persons jointly consult with the same attorney to act for them in a matter of common interest. *See City of Coralville*, 634 N.W.2d at 677–78. *See generally* 1 Rice § 4:30–:33, at 152–90 (providing a general overview of the joint client exception); Edward J. Imwinkelried, *The New Wigmore: Evidentiary Privileges* § 6.13.2(b), at 956–58 (Richard D. Friedman ed., 2002) (same); 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 503.21[1], at 503–67 to –68 (Joseph M. McLaughlin ed., 2d ed.2004) (same). This exception is based largely on the concept that joint clients have no intention or expectation to keep their communications confidential as between themselves. *See City of Coralville*, 634 N.W.2d at 677.

It is clear the joint client exception is sensitive to the rights and interests of all of the parties in the mix, including the other client who has his or her privilege invaded by the exception. For this reason, the exception only applies when a clear justification exists, and when all clients should understand that disclosure would occur because of the multi-party relationship. Disclosure is based primarily on the rights of clients who have entered into an attorney-client relationship.

On the two prior occasions we have permitted discovery of communications between an attorney and a client under the joint client exception, we have followed an analysis that considers all the surrounding circumstances to determine the existence of the essential relationship between an attorney and a client. In *Henke*, the attorney hired by the insurer actually defended the insured in litigation that included a trial. 249 Iowa at 617, 87 N.W.2d at 923.

The relationship created between the attorney and insured was purposeful, known, and very real. It involved a relationship permeated by actions that gave rise "to the usual confidences of client and attorney." *Id.* at 618, 87 N.W.2d at 923. In *City of Coralville*, we again employed the surrounding circumstances analysis to determine when and if an attorney-client relationship comes into existence. 634 N.W.2d at 679. In doing this, we rejected the notion that an attorney-client relationship is created solely because an attorney agrees to represent another. *See id.* Instead, the attorney-client relationship is not created until all of the circumstances and factors reveal a commitment to a relationship marked by "the usual confidences of client and attorney." *Henke*, 249 Iowa at 618, 87 N.W.2d at 923. Thus, we did not immediately recognize an attorney-client relationship between the police officer and the attorney retained by the city. *City of Coralville*, 634 N.W.2d at 679. No attorney-client relationship initially existed even though the police officer apparently wanted the city to obtain an attorney for him, was told the city would provide an attorney, and the attorney was employed by the city to represent the police officer. *Id.* at 676, 679. We did not recognize the exception to apply until it became clear that the attorney had taken sufficient action to show an intent to represent the police officer. *Id.* at 679.

The important point in *Henke* and *City of Coralville* is that an attorney-client relationship is not built on appearances, but substance. It is built on what an attorney-client relationship is and has always been, a close relationship of trust and confidence as shown by the circumstances. *See Henke*, 249 Iowa at 617–18, 87 N.W.2d at 923.

The majority acknowledges that an attorney-client relationship requires the at-

torney to undertake to represent the purported client, and requires the purported client to accept the attorney's services. From that statement of law, it concludes Thill undertook to represent Brandon by naming Brandon as the plaintiff in West Bend's subrogation action against the tortfeasor. It further concludes Brandon accepted Thill's service when Brandon's attorney informed West Bend in the March 7, 2001, letter that Brandon did not intend to pursue a lawsuit against the tortfeasor, and if West Bend wanted to pursue the tortfeasor "such action should be brought by West Bend through its subrogation rights as set forth in ... the policy." Brandon's attorney then concluded the letter by indicating that Brandon would cooperate "with any subrogation case" as required by the policy. I do not believe either of these events supports an attorney-client relationship.

First, Brandon clearly acknowledged that West Bend sought to pursue a subrogation claim. A subrogation claim, in the context of insurance law, is a claim by the insurer against the tortfeasor responsible for the loss to the insured. *Allied Mut. Ins. Co. v. Heiken*, 675 N.W.2d 820, 824 (Iowa 2004). A subrogation claim is not a claim by the insured. Thus, placed in the proper context of the law, the March 7 letter expresses the opposite meaning given to it by the majority. Brandon's attorney was simply informing West Bend that Brandon had no intention to pursue her personal injury claim against the tortfeasor and if West Bend wanted to protect its subrogation interests against the tortfeasor, it would need to pursue its own claim. This position is consistent with our law. Our law permits a partially subrogated insurer to assert a subrogation claim directly against a tortfeasor when the insured is unwilling (or unable) to pursue a claim against the tortfeasor for the entire loss. *Farm Bureau Mut. Ins. Co. v. Al-*

*lied Mut. Ins. Co.*, 580 N.W.2d 788, 789 (Iowa 1998). Thus, the claim in this case was entirely West Bend's claim, not Brandon's, and Brandon's decision not to pursue her own independent claim cannot be construed as assent for Thill to represent her, or to represent her in whatever interest she could ultimately acquire as a result of the subrogation action.

The same is true with the majority's claim that the cooperation clause of the insurance policy required Brandon to assent to the representation. I think insurance defense attorneys in this state will be shocked to learn that the contractual duty of an insured to cooperate with the insurer when the insurer pursues its subrogation rights means the insured agrees to enter into an attorney-client relationship with the insurer's attorney. None of these events establishes assent to an attorney-client relationship.

Second, Thill never undertook to represent Brandon by pursuing West Bend's subrogation claim against the tortfeasor in the name of the insured. Under Illinois law, a subrogation claim based on an insurance policy may be brought in the name of the insured if the insured has at least a de minimis interest in the lawsuit. *Orejel v. York Int'l Corp.*, 287 Ill.App.3d 592, 222 Ill.Dec. 811, 678 N.E.2d 683, 692 (1997). However, the interest of the insurer-subrogee cannot be concealed, and the insurer must either be named as a plaintiff or disclosed in the pleadings or by affidavit as the real party in interest. *Id.* Nevertheless, Illinois law clearly authorizes an insurer to use the insured's name when pursuing a subrogation claim. This statutory authorization certainly does not create an attorney-client relationship with the insured, but primarily serves to minimize the existence and impact of insurance. *See Nitrin, Inc. v. Bethlehem Steel Corp.*, 35 Ill.App.3d 577, 342 N.E.2d 65, 75–76 (1976)

(motion to prohibit mention of insurance coverage properly denied when insurer was real party in interest). Moreover, an attorney-client relationship is not established merely because a person may have an interest in a lawsuit.[3] Finally, even if Thill may have improperly used Brandon's name in the lawsuit, such a mistake would not create an attorney-client relationship. The mere fact that Brandon may have had an interest in the litigation does not mean Thill represented that interest.

It is abundantly clear that the facts of the case show Thill never undertook to represent Brandon. Brandon never agreed to have Thill represent her and there were no other indicia of an attorney-client relationship. Brandon and Thill never communicated with each other personally and Brandon was at all relevant times represented by another attorney, who eschewed any thought of having Brandon pursue a claim against the tortfeasor. Moreover, neither Brandon nor Thill maintained a subjective belief that an attorney-client relationship had been established. *See* 1 Rice § 4:31, at 159–60 (listing relevant factors to determine the existence of an attorney-client relationship in the joint client context). Only when Brandon later sought discovery from West Bend did she claim the existence of an attorney-client relationship with West Bend's attorney. Until that time, the existence of an attorney-client relationship between Thill and Brandon was never contemplated or imagined.

The majority looks beyond the reality of the circumstances of this case and transforms the joint client exception from a fact-based analysis of a relationship into a blunt inquiry into the existence of a legal interest a person may have in a lawsuit brought by an attorney on behalf of another. It declares the existence of an attorney-client relationship based on the manner in which the lawsuit was brought and the nature of the lawsuit itself. It relies on what could have been, not on what actually occurred. This is a grand departure from our prior cases, as well as the approach followed in other jurisdictions. *See Henke*, 249 Iowa at 617, 87 N.W.2d at 923 ("It is no answer that under the contract the insured agrees to cooperate and aid the insurer's attorney."); *see also* 1 Rice § 4:31, at 159–60. It places appearances above substance, and serves only to punish a lawyer and to unjustifiably invade the sanctity of the lawyer's relationship with the other innocent party. "The nature of the relationship, not the nature of the cause of action," is the controlling factor. *Palmer by Diacon v. Farmers Ins. Exch.*, 261 Mont. 91, 861 P.2d 895, 906 (1993).

The majority has also twisted the presumption we established in *Henke* relating to the filing of an appearance by an attorney, and utilizes this new presumption to bypass any serious consideration of the facts of the case that clearly dispel any notion of an attorney-client relationship between Thill and Brandon. In *Henke*, we said an attorney-client relationship is presumed to exist *when a person knowingly assents* to the appearance in court of an attorney on his or her behalf. *Henke*, 249 Iowa at 617, 87 N.W.2d at 923. The majority simply drops the knowingly assents to the appearance prerequisite, and declares that a presumption is created when an attorney enters an appearance in court on behalf of another, which only then may

---

**3.** I acknowledge that an attorney-client relationship between the insurer's attorney and the insured could develop in a subrogation action. However, it would develop based upon the facts of the relationship and the extent of the actual claim asserted, not the mere existence of a subrogation claim naming the insured as the plaintiff.

be rebutted by evidence that the client did not assent to the appearance. This change in the law is made without any acknowledgement or explanation. We should not change legal principles in such a manner.

This case is not about filing an appearance on behalf of Brandon. It is about an attorney filing a subrogation claim against the responsible tortfeasor on behalf of an insurance company, using the insured's name as the plaintiff as authorized by law. It is not about the creation of an attorney-client relationship. An attorney-client relationship is not artificial and detached, but is derived from conduct and intention signifying a relationship of trust, confidence, and devoted service. It requires an attorney to understand the representation has been undertaken, and for the client to accept receipt of services. *See id.* at 617–18, 87 N.W.2d at 923. These matters are absent in this case.